STATE OF NORTH CAROLINA v. KIMBERLY KNOWLES BRIGMAN

No. COA04-563

(Filed 5 July 2005)

**Constitutional Law— right of confrontation—nontestimonial hearsay—sexual abuse—statements of children conveyed through foster and adoptive parents—catchall exception—unavailable witness**

The trial court did not err in a multiple first-degree sex offense and multiple counts of indecent liberties case involving defendant mother's three sons by admitting the statements by the sons as conveyed through their foster and adoptive parents, because: (1) defendant waived her right to confront two of the boys whose statements were admitted under the catchall exception based on circumstantial guarantees of trustworthiness when defendant failed to call these two boys to testify; (2) none of the challenged statements constituted formal statements to police or other government officers; (3) although defendant implies the foster parents played a quasi-governmental role since they recorded the boys' statements and conveyed the statements to both DSS and the police, the statements are not the type of formal tes-

timonial statements envisioned by the U.S. Supreme Court in *Crawford v. Washington*, 541 U.S. 36 (2004); and (4) the boy whose statements were admitted based on the fact that he was an unavailable witness made statements spontaneously to his foster mother, who was one of the people closest to him, without the reasonable belief that the statements would be used at a subsequent trial, and statements made to family, friends, and acquaintances without an intention for use at trial have consistently been held not to be testimonial.

Appeal by defendant from judgments entered 7 November 2003 by Judge W. Erwin Spainhour in Superior Court, Rowan County. Heard in the Court of Appeals 25 January 2005.

*Attorney General Roy Cooper, by Assistant Attorney General Laura E. Crumpler, for the State.*

*J. Clark Fischer for defendant-appellant.*

McGEE, Judge.

Kimberly Knowles Brigman (defendant) was convicted of eighteen counts of first-degree sex offense and twenty-seven counts of indecent liberties with her three sons, for which she was sentenced to 576 to 715 months in prison. Defendant appeals.

The State's evidence tended to show that Rockwell Chief of Police Hugh W. Bost, Jr. (Chief Bost) responded to a call reporting unattended children in Rockwell, North Carolina on 15 April 2002. He found three boys, J.B., A.B., and N.B. (collectively the boys), ranging in age from a toddler to a pre-schooler, playing in the street. All of the boys were dirty, and the youngest was naked except for a baby t-shirt. After learning the boys' names, Chief Bost knew that defendant was their mother, and returned them to defendant's home.

Later that day, Marcus Landy (Landy) of Rowan County Child Protective Services investigated the incident. He found defendant's home to be "filthy," and described seeing spoiled food on the kitchen table and on the stove. Landy testified that the house had a "very strong urine odor," and that the three boys were dirty and their feet were black. He further testified that the youngest boy, N.B., had feces "smeared down his legs." Landy removed the boys from the home and placed them in foster care. J.B. and A.B. were placed with Ms. M.; N.B. was placed with Mr. and Mrs. A.

STATE v. BRIGMAN

[171 N.C. App. 305 (2005)]

Ms. M. testified that on 12 June 2002, she overheard J.B. saying, "[l]ick me, lick me." She then observed J.B. pulling A.B. down on top of him. J.B. told Ms. M. that he and A.B. were playing the "puppy game." J.B. further explained that the boys had played this game with defendant and defendant's husband; the game involved all of them licking each other's genitalia. Ms. M. told J.B. and A.B. to separate, called to her husband to continue making dinner, and returned to talk with J.B. and A.B. She saw J.B. on top of A.B., "humping" him. She again asked the boys what they were doing, and J.B. said they were "getting ready to play the picture game." J.B. explained that the boys would pose while defendant and defendant's husband took pictures of them. J.B. and A.B. demonstrated the poses, which were all sexually explicit. When asked how they were dressed for the "picture game," J.B. responded that they were naked.

Ms. M. reported to the Rowan County Department of Social Services (DSS) that she thought "there was more going on with the boys other than just neglect." After talking with DSS, Ms. M. continued to talk with the boys and attempted to tape-record the conversation. The tape was inaudible, but Ms. M. wrote down notes of the conversation immediately after it occurred. The boys told Ms. M. that they, defendant, and defendant's husband would start with the "picture game," and "the winner of the game got to do all the licking, and that they all ended up being winners."

Ms. M. testified that following this 12 June 2002 incident, J.B. became increasingly sexually active with A.B., which upset A.B. Both J.B. and A.B. began mental health counseling. Ultimately, the decision was made to separate J.B. and A.B. J.B. went to live with Ms. P., who later adopted him. A.B. continued to live with Ms. M. temporarily, but was eventually adopted by Mr. and Mrs. A., who also had custody of N.B.

It was determined that N.B. also needed counseling after Mr. and Mrs. A. observed N.B. trying to put toy keys in his rectum on 18 June 2002. N.B. "used the keys to the point that he excited himself and urinated on the couch." When asked what he was doing, N.B. cried and said he was sorry. Mr. and Mrs. A. began to record their observations. They noted on several occasions that N.B. stated that defendant had "hurt his butt" or hurt his penis. Mr. A. testified that N.B. said defendant had inserted keys or fingers into N.B.'s rectum, that defendant and defendant's husband had "bitten" his, J.B.'s, and A.B.'s penises. Mrs. A. testified that after she and Mr. A. had custody of A.B., A.B. stated that defendant's husband had "pulled, pinched, rubbed and

licked" A.B.'s penis and that defendant's husband had put his penis in A.B.'s mouth.

Other evidence presented by the State at trial corroborated sexual abuse of the boys. Dr. Rosalina Conroy, a pediatrician, testified as an expert in pediatric medicine. She examined all three boys in July 2002, and concluded that all of them had been sexually abused or had symptoms consistent with sexual abuse.

Defendant's written statement was also read into evidence by a police detective. The statement detailed defendant's participation in sexual abuse of all three boys. The statement described defendant's husband having defendant undress the boys and having the boys pose naked in sexual poses for photographs. The statement also described defendant holding "the boys' butt cheeks apart" while defendant's husband inserted fingers or toys into the boys' rectums, and described defendant being forced to touch the boys' penises and to hold the boys while defendant's husband engaged, and attempted to engage, in anal sexual intercourse with the boys. Defendant wrote in her statement that her husband forced her to participate in these acts by threatening to kill her. Defendant wrote that her husband first threatened her with a knife, but eventually got a gun, which defendant's husband would have "in the boys' room to intimidate [defendant]." Defendant did not present any evidence at trial.

Defendant's sole assignment of error on appeal is that the trial court erred in admitting the statements by the boys as conveyed through their foster and adoptive parents. Prior to trial, the State moved to admit hearsay statements the boys made to their foster and adoptive parents, pursuant to Rules 803(24) and 804(b)(5) of the North Carolina Rules of Evidence. The trial court conducted a voir dire hearing and determined that hearsay statements by J.B. to his foster mother were admissible pursuant to N.C. Gen. Stat. § 8C-1, Rule 804(b)(5) because J.B. was unavailable as a witness since he had testified that he did not remember "the subject matter of his statement[.]" N.C. Gen. Stat. § 8C-1, Rule 804(a)(3) (2003). The trial court did not find A.B. and N.B. unavailable as witnesses, but nevertheless admitted hearsay statements by A.B. and N.B. made to their foster and adoptive parents under the catchall hearsay exception, N.C. Gen. Stat. § 8C-1, Rule 803(24). Defendant had the opportunity to cross-examine the boys during voir dire.

Defendant does not challenge the trial court's findings of fact or the trial court's ruling at the voir dire hearing. Rather, defendant

argues that the statements by the boys were testimonial, and thus were inadmissible as a matter of law under *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177 (2004). "Where testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* at 68, 158 L. Ed. 2d at 203. In analyzing a *Crawford* claim, we must determine: "(1) whether the evidence admitted was testimonial in nature; (2) whether the trial court properly ruled the declarant was unavailable; and (3) whether defendant had an opportunity to cross-examine the declarant." *State v. Clark*, 165 N.C. App. 279, 283, 598 S.E.2d 213, 217, *disc. review denied*, 358 N.C. 734, 601 S.E.2d 866 (2004).

On the first question, the United States Supreme Court in *Crawford* chose to "leave for another day any effort to spell out a comprehensive definition of 'testimonial.' " *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203. However, the Court said at a minimum, the term "testimonial" covered "prior testimony at a preliminary hearing, before a grand jury, or at a former trial," including *ex parte* statements made in court, affidavits, depositions, confessions, and other "pretrial statements that declarants would reasonably expect to be used prosecutorially[.]" *Id.* at 51 & 68, 158 L. Ed. 2d at 193 & 203. Additionally, the Court identified "[s]tatements taken by police officers in the course of interrogations" as being testimonial. *Id.* The Supreme Court did not define "interrogation" with any particularity in *Crawford*, other than to say that a recorded statement made to police by Crawford's wife, "knowingly given in response to structured police questioning, [qualified] under any conceivable definition [of interrogation.]" *Id.* at 53 n.4, 158 L. Ed. 2d at 194 n.4. The Court did specify, however, that it was using "interrogation" in its colloquial, not technical legal sense. *Id.*

In the present case, defendant does not argue that the boys' statements were prior testimony. Rather, defendant argues that these challenged statements were testimonial because they were elicited in a manner similar to formalized police questioning. Specifically, regarding the statements by J.B. and A.B., defendant contends that because Ms. M. tape-recorded an interview with the boys and provided this evidence to DSS and police investigators, "this hearsay evidence was far more akin to the type of police action at issue in *Crawford* than [to] 'an off-hand, overheard remark.' " *See Crawford*, 541 U.S. at 51, 158 L. Ed. 2d at 192 ("[N]ot all hearsay implicates the Sixth Amendment's core concerns. An off-hand, overheard remark might be

unreliable evidence and thus a good candidate for exclusion under hearsay rules, but it bears little resemblance to the civil-law abuses the Confrontation Clause targeted."). Similarly, defendant contends that the statements made by N.B., as testified to by Mr. & Mrs. A, were also akin to "official investigations" in that they were "reduced to notes which were provided to the prosecution." We are not persuaded by defendant's arguments.

First, we note that defendant's arguments only pertain to statements made by J.B. because he was the only witness determined to be unavailable by the trial court. The trial court specifically found that "regarding [A.B.'s and N.B.'s] testimony, that they do not fit within the definition of unavailability under the statute." The trial court ruled that the statements of A.B. and N.B. were admissible hearsay under Rule 803(24), which provides that hearsay evidence may be admitted, "even though the declarant is available as a witness[,]" if it has "circumstantial guarantees of trustworthiness," and

> if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

N.C. Gen. Stat. § 8C-1, Rule 803(24) (2003). *Crawford* revised the standard for admissibility of hearsay evidence under the Confrontation Clause of the Sixth Amendment of the United States Constitution only when the witness is *unavailable. Crawford,* 541 U.S. at 60-69, 158 L. Ed. 2d at 198-203. A defendant's right to confront defendant's accuser is not compromised when the declarant is available to testify. However, a defendant may waive this right "by simply failing to exercise it at the trial." *State v. Splawn,* 23 N.C. App. 14, 18, 208 S.E.2d 242, 245 (stating that a defendant's confrontational rights may be waived "by an accused's counsel acting in his behalf"), *cert. denied,* 286 N.C. 214, 209 S.E.2d 318 (1974). In the present case, A.B. and N.B. were "available" to testify, although neither the State nor defendant called them to testify. Defendant therefore waived her right to confront A.B. and N.B., and defendant's arguments as they relate to the statements made by A.B. and N.B. are overruled.

Second, and more importantly, none of the challenged statements constituted formal statements to police or other government offi-

cers.[1] Courts in some other states have held statements made by children to social workers or police investigators to be testimonial where the evidence suggested that "the government was purposefully creating formalized statements for potential use at trial." Robert P. Mosteller, *Crawford v. Washington: Encouraging and Ensuring the Confrontation of Witnesses*, 39 U. Rich. L. Rev. 511, 538 (2005); *see also People v. Vigil*, 104 P.3d 258, 262 (Colo. App. 2004) (holding a videotaped statement given by a child to a police officer who had told the child she was a police officer, had ascertained that the child knew the difference between the truth and a lie, and had told the child to tell the truth, to be testimonial), *cert. granted on this issue* (Colo. 20 December 2004) (unpublished opinion) (appeal pending); *Snowden v. State*, 846 A.2d 36, 47 (Md. App. 2004) (statements made by children conveyed through a social worker held to be testimonial when the statements were taken by the social worker with the expressed purpose of developing the social worker's testimony in a child abuse case), *aff'd*, 867 A.2d 314 (Md. 2005). However, the statements in the present case were not procured by a government officer. *See People v. Geno*, 683 N.W.2d 687, 692 (Mich. App. 2004) (concluding that a child's statement to the executive director of a children's assessment center, who was not a government employee, was not testimonial), *appeal denied*, 688 N.W.2d 829 (Mich. 2004). Rather, in the present case, the statements were made to the boys' foster parents. Although defendant implies that the foster parents played a quasi-governmental role because they recorded the boys' statements and conveyed the statements to both DSS and the police, we do not find the statements in the present case to be the formal testimonial statements envisioned by the U.S. Supreme Court in *Crawford*.

The statements made by J.B. were made spontaneously to one of the people closest to him, his foster mother. "[S]tatements made to family, friends, and acquaintances without an intention for use at trial have consistently been held not to be testimonial." Mosteller, 39 U. Rich. L. Rev. at 540. For example, our Court has held that statements made by a victim of an armed burglary to his wife and daughter before he died were not testimonial, but were personal conversations, unlikely to have been made with the belief that the statements would be used prosecutorially. *State v. Blackstock*, 165 N.C. App. 50, 62, 598 S.E.2d 412, 420 (2004), *disc. review denied*, 359 N.C. 283, 610 S.E.2d 208 (2005). *See also State v. Rivera*, 844 A.2d 191, 202

---

1. Though we only address defendant's arguments as they pertain to J.B., we note that the analysis and resulting conclusions regarding the statements made by A.B. and N.B. would be the same.

(Conn. 2004) (holding that a declarant's statement to his nephew about the declarant's involvement with the defendant was not testimonial because "the circumstances under which the statement was made would not lead an objective witness reasonably to believe that the statement would be available for use at a later trial").

Some of J.B.'s statements to Ms. M. were arguably solicited by Ms. M. after she ended her telephone conversation with DSS and while she was trying to tape-record the conversation. However, the information conveyed during this part of the conversation was first revealed prior to Ms. M.'s telephone call to DSS. The only new information obtained was that J.B. told Ms. M. that "the winner of the [picture] game got to do all the licking, and that they all ended up being winners." The majority of the evidence from this 12 June 2002 conversation was revealed because Ms. M. asked J.B. and A.B. what they were doing after she observed J.B. pulling A.B. onto him, asking A.B. to lick him, and observed J.B. "humping" A.B. J.B.'s statements were spontaneous answers to Ms. M.'s open-ended inquiries. No evidence suggests that J.B. made these statements with the idea that they would be used prosecutorially.

Additionally, J.B.'s age raises the question as to whether he was even capable of reasonably believing that these statements would be used at trial. We recognize that this argument was rejected by the Colorado Court of Appeals in *Vigil*, 104 P.3d at 262, but note that the facts in *Vigil* were significantly different than those in the case before us. In *Vigil*, the challenged statement came from a seven-year-old child during a videotaped interview with a police officer who had "extensive training in the particular interrogation techniques required for interviewing children." *Id.* at 262. The interviewer had told the child that she was a police officer and had asked the child what the child thought should happen to the defendant, to which the child responded that the defendant should go to jail. *Id.* The police officer then told the child that the child would need to talk to a district attorney who was going to try to put the defendant in jail. *Id.* at 263. The trial court determined that "[t]his discussion, together with the interviewer's emphasis at the outset regarding the need to be truthful, would indicate to an objective person in the child's position that the statements were intended for use at a later proceeding that would lead to punishment of [the defendant]." *Id.*

In the present case, not only were none of the challenged statements made directly to a police officer, but also J.B. was younger than the child in *Vigil*. J.B. was not quite six years old at the time he

made these statements and was less likely to understand the potential for his statements to be used prosecutorially than the child in *Vigil*. Also, unlike the child in *Vigil*, J.B. did not make any statements indicating that he understood the consequences of his statements or how they might be used to put defendant in jail. For instance, nothing in the record suggests that J.B. was asked what he thought should happen to defendant. Nor was J.B. given the opportunity to talk to a district attorney who would be trying to put defendant in jail. Finally, J.B. did not seem to know that what defendant and defendant's husband were making the boys do constituted criminal activity. Ms. M. testified that J.B. seemed surprised that Ms. M. did not know that the boys were naked when they had played "the picture game" with defendant and defendant's husband. This surprise suggests that J.B. was making these statements to his foster mother innocently, without the purpose of the statements being used at defendant's subsequent trial. When this evidence is taken together, it is highly implausible that J.B. reasonably believed that his statements to his foster mother would be used prosecutorially. Since J.B.'s statements were made to a person close to him, and without the reasonable belief that the statements would be used at a subsequent trial, we conclude that the statements were not testimonial.

As such, we need not address "whether the trial court properly ruled [that] the declarant [J.B.] was unavailable" or "whether defendant had an opportunity to cross-examine the declarant." *See Clark*, 165 N.C. App. at 283, 598 S.E.2d at 217. Moreover, "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law[.]" *Crawford*, 541 U.S. at 68, 158 L. Ed. 2d at 203. The trial court did not err in admitting these challenged statements as hearsay exceptions. As defendant does not challenge the trial court's admission of this evidence on any additional grounds, we find no error.

No error.

Judges WYNN and TYSON concur.