STATE OF NORTH CAROLINA v. RICHARD LANE BRIGMAN

No. COA05-712

(Filed 20 June 2006)

**1. Evidence— hearsay—nontestimonial—residual hearsay exception**

The trial court did not abuse its discretion in a multiple first-degree sex offense and multiple taking indecent liberties with a minor case by admitting the children's hearsay statements to their foster parents and to medical personnel, because: (1) defendant concedes that the statements made to the children's foster parents were not testimonial, and therefore, did not violate the Confrontation Clause; (2) the children's statements to their foster

———————

STATE v. BRIGMAN

[178 N.C. App. 78 (2006)]

parents were admissible under the residual hearsay exception when the children testified they had told the foster parents about things defendant had done but did not remember what they told the foster parents, the statements were more probative on the points for which they were offered than any other evidence the State could produce through reasonable efforts at the time, the State gave proper notice of its intent to offer the statements, the children's statements possess equivalent circumstantial guarantees of trustworthiness, and it cannot be said the trial court's findings and conclusions were manifestly unsupported by reason or were so arbitrary that they could not have been the result of a reasoned decision; and (3) Child 3's statements to a doctor (that defendant put his hand in the child's bottom, that it hurt, and that defendant touched the two other children in the same way) were not testimonial and defendant's right to confrontation was not violated when it cannot be concluded that a reasonable child under three years of age would know or should know that his statements might later be used at trial.

**2. Evidence— expert testimony—sexual abuse—credibility— posttraumatic stress disorder—plain error analysis**

Although the trial court erred in a multiple first-degree sex offense and multiple taking indecent liberties with a minor case by admitting certain statements made by two expert witnesses including that the children suffered sexual abuse by defendant, concerning Child 3's credibility, and regarding the children's symptoms of posttraumatic stress disorder, it did not amount to plain error because it cannot be concluded that there was a reasonable possibility that a different result would have been reached by the jury when the evidence against defendant was overwhelming.

**3. Constitutional Law— right to unanimous jury verdict**

The trial court did not err or commit plain error in a multiple first-degree sex offense and multiple taking indecent liberties with a minor case by failing to require the jury to be unanimous as to the actus reus for each charge, because: (1) the risk of a nonunanimous verdict does not arise even if the jury considered a greater number of incidents than charged in the indictments because, while one juror might have found some incidents of misconduct and another juror might have found different incidents of misconduct, the jury as a whole found that improper sexual conduct occurred; and (2) the jury was instructed on all issues

**STATE v. BRIGMAN**

[178 N.C. App. 78 (2006)]

including unanimity and separate verdict sheets were submitted to the jury for each charge.

### 4. Discovery— documents—review of records submitted under seal

The trial court did not err in a multiple first-degree sex offense and multiple taking indecent liberties with a minor case by failing to require the State to provide certain documents to defendant prior to trial, because upon careful review of the records submitted under seal, the Court of Appeals did not find any exculpatory evidence that would entitle defendant to a new trial.

### 5. Appeal and Error— motion for appropriate relief—recantation of witness's testimony

Defendant's motion for appropriate relief must be remanded based upon the alleged recantation of the testimony of defendant's wife, because the Court of Appeals cannot determine the veracity of the witness's testimony, nor can it discern whether there is a reasonable possibility that a different result would have been reached at trial had the witness's testimony at trial been different or nonexistent.

### 6. Appeal and Error— amended motion for appropriate relief—dismissal without prejudice

Defendant's amended motion for appropriate relief alleging new grounds including ineffective assistance of counsel is dismissed without prejudice to defendant to file a new motion for appropriate relief in the superior court, because this motion did not amend the previous motion nor was it timely filed.

Appeal by defendant from judgments entered 15 July 2004 by Judge W. Erwin Spainhour in Rowan County Superior Court. Heard in the Court of Appeals 27 March 2006.

*Attorney General Roy Cooper, by Assistant Attorney General Anne M. Middleton, for the State.*

*Miles & Montgomery, by Mark Montgomery, for the defendant.*

MARTIN, Chief Judge.

Defendant was convicted by a jury of eighteen counts of first degree sex offense and twenty-seven counts of taking indecent

**STATE v. BRIGMAN**

[178 N.C. App. 78 (2006)]

liberties with a minor. The convictions were consolidated into five judgments, for which he received two sentences of 339 months to 416 months imprisonment and three sentences of twenty-five to thirty months imprisonment, all to be served consecutively. Defendant appeals. ·

The State presented evidence at trial tending to show that on 15 April 2002, the Rockwell Police Department received a call from defendant's neighbor regarding three children who were walking down the street towards Highway 152. Hugh W. Bost, Jr., Chief of Police for the town of Rockwell, responded to the call and located the three children.[1] They were all boys of pre-school or kindergarten age. The youngest of the three was not wearing any clothes, and Chief Bost smelled what he believed to be feces on his legs. The older two were "haphazardly clothed and dirty." One of the children told Chief Bost where they lived, and when he took them to the residence, Kimberly Brigman, defendant's wife and the mother of all three children, answered the door. She was not aware the children had left the house. At that time, Chief Bost returned the children to Mrs. Brigman.

Chief Bost reported the incident to the Rowan County Department of Social Services (DSS). Marcus Landy, a DSS investigator/case manager with Child Protective Services, went to defendant's residence later that night to investigate the home. When he arrived, he noted the children were extremely dirty with black feet and dirty palms. They had "feces down their legs where they had used the bathroom on themselves." The youngest child was "soaking wet" with urine. Mr. Landy noticed the entire home smelled like urine, and Kimberly Brigman told him the children used the bathroom in the corners of the house. Mr. Landy also found moldy food in the kitchen and noticed that the refrigerator was dirty. He believed it was in the children's best interest to be taken into DSS custody immediately, and they were placed with foster parents that night.

Foster parents Tammy and Michael McClarty took in the older two boys, Child 1 and Child 2, who were four and five years old respectively. Tammy McClarty testified that over the next few months, both boys, but particularly Child 2, had numerous bowel movements in their pants. On or around 12 June 2002, Mrs. McClarty

---

1. In order to preserve confidentiality with respect to the identities of the three child victims, we will refer to them throughout this opinion as Child 1, Child 2, and Child 3.

heard Child 2 in another room screaming, "Lick me, lick me." When she went to see what they were doing, she observed them on the couch and "[Child 2] was laying on his back and [Child 1] was laying on top of him, and [Child 2] had [Child 1] by his shoulders and he was face to face and he was screaming, 'Lick me, lick me.' " She asked the boys what they were doing, and Child 2 said they were playing "puppy." She separated the boys on the couch, and went to tell her husband she could not help with dinner at the moment. When she returned, "[Child 1] was laying on his back, and [Child 2] was laying next to him and had his hands between [Child 1's] legs." She again asked what they were doing, and they said they were playing the "picture game." The boys said the picture game was when defendant and their mother would take pictures of them. The boys demonstrated sexual poses they would do for the pictures and said they were not wearing any clothes when the pictures were taken.

The boys also described a "licking" game to Mrs. McClarty. She testified Child 2 told her that in this game, "they would lick each other's naked butts and naked weenies." He said defendant and their mother were both present when they played, as well as their youngest brother, Child 3, and that defendant "was the winner so he got to lick everyone's naked butts and naked weenies." Child 2 said he was also a winner so he got to "lick his mommy's butt. . . . and [Child 1's] too." Child 1 at first denied licking anyone, but then admitted to licking "Mommy's butt." Child 2 stated that Child 3 also "licked the weenie." When Mrs. McClarty questioned them on what they meant by "weenie," Child 2 "pointed to his crotch area and said, 'this weenie.' " Mrs. McClarty recorded this conversation on a tape recorder, then later that night typed out notes from the recording. She reported the conversation to DSS and gave her notes to the boys' social worker. Two attempts were made to interview the boys in the next few days, but they would not talk to the interviewers. Mrs. McClarty also took the boys to the Northeast Medical Center for medical examinations.

Child 2 was adopted; his adoptive mother testified at trial that when Child 2 first came into her home in July of 2002, he had "severe night traumas" four to six times a night, numerous temper tantrums, and "[h]e continuously soiled his pants." Over time, his behavior, sleep, and bowel control improved greatly. However, when he was in the courtroom for defendant's trial, "he wet his pants." Since that day, according to his adoptive mother, he had "continued to wet and soil his pants," he was "having tantrums that he hadn't had in several months," and he did not want to eat or sleep.

Child 3 was two years old when he was placed in DSS custody in April of 2002. He went to the home of foster parents, who also took in Child 1 in July of 2002. The foster mother testified that one night as she was preparing to give Child 3 a bath, he took a set of plastic baby keys and "shove[d] one of them up into his rectum." He also "took his index finger and stuck it up in his bottom." She testified that Child 3 said "Kim put keys in me. Kim did it. Kim did it." About a week later, Child 3 again said that Kim put keys and a finger in his bottom. On another occasion, Child 3 also "rub[bed] his private part on [the] couch and excited himself" so that he urinated. The foster mother also testified that Child 1 told her defendant "messed with his weenie all the time. . . . [and] that Richard pulled pinched, rubbed, and licked his weenie." Child 1 told her defendant "put his weenie in [Child 1's] mouth . . . . [and] this made him choke and sometimes throw up." Child 1 said "he had to swallow white stuff that looked like milk." Since the trial began, Child 1 and Child 3 have both had nightmares every night. Child 1 woke up screaming "Richard, Richard, please do not hurt me." Child 3 said he dreamed about "Kim hurting [Child 1] and Richard hurting [Child 2]." Upon seeing defendant in the court-room at trial, Child 1 became very angry, and Child 3 told his foster mother he "did not like seeing Richard because Richard was bad."

The boys' foster father testified that Child 3 told him "Kim and Richard" bit all three boys on their "weenie[s]." Child 3 also said defendant put his "weenie" in the child's mouth, as well as in his brothers' and Kim's mouths. The foster father also found Child 3 masturbating one day, and the child told him defendant had "[p]layed with me [sic] weenie." Child 1 and Child 3 both told the foster father defendant made them take their clothes off and watch pornography. They also described an occasion where defendant urinated into a cup and the whole family drank it. They also had to "drink pee from his weenie" and "sometimes it was white." Child 1 described one of his nightmares to the foster father in which "Kim had my weenie in her mouth." Child 1 said this had really happened to him, as well as to the other boys and to defendant. When the foster father asked what defendant was doing in that dream, Child 1 said he was "hitting [his butt] inside and outside with a stick." The foster father asked if this was something that had really happened, and Child 1 said yes. Child 1 had numerous nightmares involving defendant and Kim hurting him.

Kimberly Brigman testified at trial and described the sexual abuse of the three children. She said she first suspected the abuse

when Child 2 requested a bedtime story defendant had told him "about a little girl and her father, about them kissing and touching their private parts." When she confronted defendant about the story, he "got ballistic." Some time later, she got up in the middle of the night and went to the room where Child 1 and Child 2 slept. Defendant was in the room with the boys, who were naked, and defendant was telling them to touch each other and pose in sexually suggestive positions. When defendant saw her, he forced her into the room and told her if she would be quiet, no one would get hurt. She then witnessed defendant make Child 2 touch defendant's erect penis and defendant ejaculate onto Child 2's stomach. She testified Child 2 said "Mama, don't cry. It's okay. This way he won't hurt us." She testified she did not leave defendant because she was afraid of him; she said he had a very violent side and kept a gun in their bedroom.

Kimberly Brigman testified that "[a]fter that night, [the abuse] started getting more in depth as far as [defendant] trying to penetrate the boys, more so with [Child 2]." She stated defendant would penetrate the boys in "their behinds" with fingers, toys, and his penis. Defendant once forced her to hold Child 2 down while defendant penetrated him with a finger. She also witnessed defendant perform oral sex on the boys and have the boys perform oral sex on him. She said she saw defendant abuse Child 2 more than ten times and "[p]robably a little less with [Child 1]." She also saw defendant take pictures of Child 3 in his crib without any clothes on. Unlike Child 1 and Child 2, who are Kimberly Brigman's children by a former marriage, Child 3 is defendant's biological son. She found pictures defendant had hidden of defendant "and the boys touching each other." She saw blood coming out of Child 2's anal area a few times and out of Child 1's anal area once. Kimberly Brigman denied that the boys ever licked her or that she had ever licked them.

Dr. Rosalina Conroy, a pediatrician with a specialty in the diagnosis of sexual abuse injuries, performed a medical examination of the three children and testified as to her findings. She testified that when diagnosing sexual abuse, she considers, in addition to physical findings, the behavior of the child and any disclosures the child makes. She said the three boys were "some of the most unruly, difficult children [she had] ever had to examine." Child 1 and Child 2 were so hyperactive Dr. Conroy could barely examine them or interview them during their examinations. She was, however, able to conduct a thorough examination of Child 3 and ask him if anything had "happened to [his] bottom." Child 3 disclosed that defendant had "put his

hand in his bottom and it hurt" and that defendant had similarly touched the other two boys.

Dr. Conroy testified that the physical findings in these children alone were very significant in her diagnosis of sexual abuse. During her examination of Child 3, Dr. Conroy observed evidence of trauma to the anal area and loosening of the muscle. She observed a loss of rugae, or the normal folds of the anal area. Where there should have been a "wavy pattern," the skin had become smooth "through repeated trauma, through friction." She also observed a triangular scar pointing into the anal opening, which she testified indicated "repeated anal trauma, penetrating anal trauma, because the . . . apex of the scar was pointing into the anus, and it was thicker than just one episode of trauma, it was thicker, so that told me it was repeated." She testified that the condition of Child 3's anal area could have been caused by the penetration of a penis, a hand, or a toy but probably not by a finger "because of the extent of the damage." Dr. Conroy found similar scars in Child 1 and Child 2 and abnormal rugae in Child 2. She testified that penetration by either a finger, a penis, or a toy could have caused their scars and that the scars were consistent with repeated penetration.

Before trial, Dr. Conroy reviewed the following additional documents: (1) a statement by Kimberly Brigman, (2) notes taken by the foster parents about the children's statements and behavior, and (3) a psychologist's report concluding the children were suffering from post-traumatic stress disorder (PTSD). She testified these documents strengthened her opinion that the children had been sexually abused. The statement by Kimberly Brigman corroborated and "explained" the physical findings. PTSD is common in abused children, and a classic symptom of PTSD is "flashbacks that keep coming in and disrupting their thoughts, disrupting their behavior." The foster parents' notes indicated the children would spontaneously describe abuse at times like driving out to get ice cream, which suggested the children were having PTSD flashbacks. The children also had sleep disturbances, another symptom of PTSD.

Dr. Kathleen Russo, a pediatrician also specializing in the diagnosis of sexual assault injuries in children, reviewed Dr. Conroy's findings, psychiatric records, interviews with Kimberly Brigman, and notes from the foster parents, and she testified to her conclusions at trial. Dr. Russo did not examine the boys herself. Like Dr. Conroy, Dr. Russo believed the physical findings indicated repeated penetrating trauma, and the descriptions of abuse by Kimberly Brigman and the

children's disclosures to their foster parents supported the physical findings of repeated sexual abuse. When asked if she had "an opinion to a reasonable degree of medical certainty as to whether or not these children had been repeatedly sexually penetrated," Dr. Russo stated: "Yes, I would come to the conclusion that based on the history, the statements, the records, and the physical findings, that these children suffered sexual abuse by Mr. Richard Brigman."

Anthony Bolden was an inmate at Albemarle Correctional Facility with defendant in May, June, and July of 2002. He testified that he had a bisexual relationship with defendant while in prison and that defendant told him about certain sexual acts he committed with the children. One such act was called "slick legs," where defendant would "put [his] thing between they [sic] thighs and not penetrate, just hump." Mr. Bolden also testified defendant admitted showing the children pornographic movies and taking pictures of them naked.

Defendant's step-daughter and his daughter by another marriage both testified that defendant used to play pornographic movies for them and touch them between their legs with his hand and mouth. Defendant pled guilty to charges of molesting these two girls, and he was on probation for those offenses at the time of the offenses in the present case. After a report that defendant had contacted a twelve or thirteen year old girl over the Internet about having sex, his probation officer conducted a search of his home. The officer did not find any photographs or pornography in the home or on his computer, but she did find a gun under his bed, for which his probation was revoked.

Defendant testified in his own defense at trial. He denied ever touching or taking sexual pictures of either of the three boys. He denied being a homosexual and having a sexual relationship with Anthony Bolden while in prison. He testified that Child 1 and Child 2's biological father used to take them every other weekend, and that Child 1 and Child 2 lived with their father for three months when defendant and Kimberly first moved in together.

Defendant's mother testified that when defendant and Kimberly were living with her, defendant was never alone with the boys. She also testified that defendant did not date men and that Child 2 had accused his biological father of sexual abuse in 2000. Social worker Bruce Titus testified that Child 2 once said his "daddy" had hurt him and "pulled [his] weenie," but later said neither his daddy nor his mother nor defendant had hurt him. Mr. Titus said Child 2 "changed his story several times." Child 2 also denied having been

touched "in his private areas" to social worker Marcus Landy in November of 2001.

Defendant makes the following arguments on appeal: (1) the trial court erred in admitting the children's hearsay statements to their foster parents and to medical personnel; (2) the trial court erred or committed plain error in admitting certain statements made by expert witnesses Dr. Conroy and Dr. Russo; (3) the trial court erred or committed plain error by not requiring the jury to be unanimous as to the *actus reus* for each charge; and (4) the trial court erred in failing to require the State to provide certain documents to the defendant prior to trial.

**[1]** First we address defendant's argument that the trial court erred in admitting the out-of-court statements the children made to their foster parents and pediatricians. Defendant argues the statements made to the children's foster parents were testimonial; however, defendant concedes that this Court conclusively determined in the case against the children's mother, *State v. Kimberly Brigman*, 171 N.C. App. 305, 310-11, 615 S.E.2d 21, 24, *disc. review denied*, 360 N.C. 67, 621 S.E.2d 881 (2005), that the out-of-court statements made by the children to their foster parents were not testimonial and therefore did not violate the Confrontation Clause of the Sixth Amendment to the United States Constitution under *Crawford v. Washington*, 541 U.S. 36, 158 L. Ed. 2d 177 (2004). This argument is overruled.

Defendant also argues the children's statements to their foster parents should not have been admitted under the residual hearsay exception. N.C. Gen. Stat. § 8C-1, Rule 804(b)(5) (2005). The admissibility of hearsay statements pursuant to the residual hearsay exceptions lies "within the sound discretion of the trial court." *State v. Smith*, 315 N.C. 76, 97, 337 S.E.2d 883, 847 (1985). Therefore, "the trial court's ruling should not be overturned on appeal unless the ruling was manifestly unsupported by reason or was so arbitrary that it could not have been the result of a reasoned decision." *State v. Hyde*, 352 N.C. 37, 55, 530 S.E.2d 281, 293 (2000) (quotation omitted), *cert. denied*, 531 U.S. 1114, 148 L. Ed. 2d 775 (2001).

At the hearing of the State's motion to introduce the out-of-court statements, each child testified on *voir dire* that he had told his foster parents about things that defendant had done, but he did not remember what he had told his foster parents. The trial court therefore determined that the three children were unavailable to testify at

trial "due to the fact that each has no memory of the subject matter of his statement that the State seeks to introduce into evidence." N.C. Gen. Stat. § 8C-1, Rule 804(b)(5) states that a statement may be admissible at trial where the declarant is unavailable to testify if the statement is:

> not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it gives written notice stating his intention to offer the statement and the particulars of it, including the name and address of the declarant, to the adverse party sufficiently in advance of offering the statement to provide the adverse party with a fair opportunity to prepare to meet the statement.

The trial court made findings of fact regarding each of the requirements set forth in the statute above. It found that "[t]he proffered statements are evidence of material facts in these cases. The acts described are evidence of first-degree sex offenses and taking indecent liberties with children." The court also found the statements "were more probative on the points for which they [were] offered than any other evidence the State could produce through reasonable efforts" at the time. The only eyewitness to these acts other than defendant and the boys, who were found to be unavailable, was Kimberly Brigman. The court found that "[i]t is not at all clear at this point in the trial that Kimberly Brigman, whose convictions for these same crimes are now on appeal, can or will testify." Because Kimberly Brigman attempted several times to recant her statements made against defendant, we conclude the trial court did not abuse its discretion in making this finding.

Pursuant to part (C) of the statute, the trial court found:

> The general purposes of the rules of evidence and the interests of justice will best be served by admission of the statements into evidence. In fact, the court finds that it would be an exceptional injustice to refuse to allow the jury to consider the proffered

statements that have been made to adults in whose company the boys felt safe and protected.

The trial court was only required to "state [its] conclusion in this regard." *State v. Triplett*, 316 N.C. 1, 9, 340 S.E.2d 736, 741 (1986). Under Rule 804(b)(5) and *State v. Triplett*, the trial court was also required to "determine that the proponent of the hearsay provided proper notice to the adverse party of his intent to offer it and of its particulars." *Id.* The trial court made the following finding of fact regarding notice:

> The State has given proper notice to the defendant of the State's intent to offer the statements of [the three alleged victims] into evidence. Copies of the statements made by the children to [their foster parents], and proffered by the State at the hearing of this motion, were served upon the defendant in apt time.

"After the trial judge determines the notice requirement has been met, he must next determine that the statement is not covered by any of the exceptions listed in Rule 804(b)(1)-(4). The trial judge need only enter his conclusion in this regard in the record." *Id.* (internal citation omitted). The trial court therefore made the following finding: "The proffered statements of [the three children] are not covered by any of the hearsay exceptions listed in N.C. Gen. Stat. § 8C-1, Rule 804(b)(1)-(4) and Rule 803(1)-(23)."

Finally, under *Triplett*, the trial court was required to "include in the record his findings of fact and conclusions of law that the statement possesses equivalent circumstantial guarantee of trustworthiness." *Id.* (quotation omitted). The trial court made the following findings of fact in this regard: (1) "[t]he discussion of sexual matters was initiated spontaneously by the children themselves;" (2) "the adults to whom the statements were made were credible witnesses, and . . . a reasonable jury could find them to be credible;" (3) "[t]he nature of the statements themselves tends to show that they are trustworthy. . . . These very explicit sexual statements . . . would not ordinarily be stated by boys of this age unless the statements were true;" (4) "[t]he court had an opportunity to see the three boys on the witness stand at the hearing of the motion. It appeared obvious to the court . . . that their presence on the witness stand in front of the defendant was traumatic for them;" (5) "[a]ll three children have personal knowledge of the events alleged in the indictments;" (6) "[t]he children experienced nightmares and had difficulty sleeping. It was only after they became accustomed to a safe environment that they

made the statements in question;" and (7) "[t]he boys have never retracted any of the statements." The trial court therefore concluded as a matter of law that the children's statements possess equivalent circumstantial guarantees of trustworthiness.

We cannot say the trial court's findings of fact and conclusions of law regarding the admissibility of the children's out-of-court statements to their foster parents was "manifestly unsupported by reason or was so arbitrary that it could not have been the result of a reasoned decision." *Hyde*, 352 N.C. at 55, 530 S.E.2d at 293 (quotation omitted). Thus, we conclude the trial court did not abuse its discretion in admitting these statements under the residual hearsay exception. This argument is overruled.

Defendant further argues the children's statements to medical personnel were (1) testimonial in nature and therefore inadmissible under *Crawford v. Washington*, and (2) not made for medical purposes and therefore do not fit the medical treatment hearsay exception under N.C. Gen. Stat. § 8C-1, Rule 803(4) and *State v. Hinnant*, 351 N.C. 277, 523 S.E.2d 663 (2000), *cert. denied*, 544 U.S. 982, 161 L. Ed. 2d 737 (2005). Although defendant asserts that "[b]oth Dr. Conroy and Dr. Russo testified to statements made to them by the boys," the only statement made by any of the children to a medical examiner was by Child 3 to Dr. Conroy. Dr. Conroy testified that Child 3 told her "Richard put his hand in his bottom and it hurt, and . . . he touched [Child 1] and [Child 2] the same way." At trial, defendant objected to this testimony only on the basis of "confrontation." Because he failed to object under the medical treatment hearsay exception, we will not consider that argument on appeal. *State v. Augustine*, 359 N.C. 709, 721, 616 S.E.2d 515, 525 (2005) (where defendant objected to testimony at trial on the ground of speculation, the Court would not consider his argument on appeal that it was impermissible character evidence).

Our Supreme Court has held that "[f]ollowing *Crawford*, the determinative question with respect to confrontation analysis is whether the challenged hearsay statement is testimonial." *State v. Lewis*, 360 N.C. 1, 14, 619 S.E.2d 830, 839 (2005). Further, it has stated that an

> additional prong of the analysis for determining whether a statement is 'testimonial' is, considering the surrounding circumstances, whether a reasonable person in the declarant's position would know or should have known his or her statements would

be used at a subsequent trial. This determination is to be measured by an objective, not subjective, standard.

*Id.* at 21, 619 S.E.2d at 843. At the time of his medical examination by Dr. Conroy, Child 3 was not quite three years old. This Court found in the case against Kimberly Brigman that it was highly unlikely that Child 2, who was almost six when he made statements to his foster parents, understood his statements might be used at a subsequent trial. *Brigman*, 171 N.C. App. at 312-13, 615 S.E.2d at 25-26. We cannot conclude that a reasonable child under three years of age would know or should know that his statements might later be used at a trial. Therefore, we hold Child 3's statement to Dr. Conroy was not testimonial, and defendant's right to confrontation was not violated. This argument is overruled.

[2] Defendant's next argument is that the trial court committed plain error in admitting certain testimony by expert witnesses Dr. Conroy and Dr. Russo. Defendant assigns error to the admission of one statement made by Dr. Conroy and two statements made by Dr. Russo. Defendant did not object to this testimony at trial; therefore, defendant relies on plain error review to raise this issue on appeal. The plain error rule provides that the Court may review alleged errors affecting substantial rights even though defendant failed to object to the admission of the evidence at trial. *State v. Cummings*, 346 N.C. 291, 313, 488 S.E.2d 550, 563 (1997), *cert. denied*, 522 U.S. 1092, 139 L. Ed. 2d 873 (1998). Our Supreme Court has chosen to review such issues when the appellant has alleged plain error in the assignments of error "and when the issue involves either errors in the trial judge's instructions to the jury or rulings on the admissibility of evidence." 346 N.C. at 313-14, 488 S.E.2d at 563. The rule must be applied cautiously, however, and only in exceptional cases where, "after reviewing the entire record, it can be said the claimed error is a fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done." *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (citation and emphasis omitted). Thus, the appellate court must study the whole record to determine if the error had such an impact on the guilt determination, therefore constituting plain error. *Id.* at 661, 300 S.E.2d at 378-79.

Defendant contends that Dr. Russo's conclusion "that these children suffered sexual abuse by Mr. Richard Brigman" constituted expert testimony on the guilt of the defendant. We agree. He also correctly argues that Dr. Russo impermissibly testified about the victim's

credibility when she made the following statement regarding Child 3's disclosure to Dr. Conroy that defendant "put his hand in his bottom and it hurt": "where a child not only says what happened but also can tell you how he felt about it is pretty significant because it just verifies the reliability of that disclosure." While an expert's opinion that the children were sexually abused is "clearly admissible under prior decisions of this Court, [the] opinion that the children were sexually abused *by defendant* was not . . . [because the] opinion that the children were sexually abused *by defendant* did not relate to a diagnosis derived from [the] expert['s] examination of the prosecuting witnesses in the course of treatment" making it improper opinion testimony concerning the victims' credibility. *State v. Figured*, 116 N.C. App. 1, 9, 446 S.E.2d 838, 843 (1994) (emphasis in original), *disc. review denied*, 339 N.C. 617, 454 S.E.2d 261 (1995). Our Supreme Court has previously found error where an expert testified that a sexual assault victim was "believable." *State v. Aguallo*, 318 N.C. 590, 599, 350 S.E.2d 76, 81 (1986). However, in *Aguallo*, "the State's case hinged on the victim's testimony and thus upon her credibility." *Id.*, 350 S.E.2d at 82. In that case, "[t]he evidence of the defendant's guilt was strong but not overwhelming," and there was "a reasonable possibility that a different result would have been reached by the jury" had the expert's testimony not been admitted at trial. *Id.* at 599-600, 350 S.E.2d at 82.

Here, the evidence against the defendant is overwhelming. The children's statements to their foster parents, which we have deemed admissible, described details of the abuse and identified defendant as their abuser. They acted out the sexual "games" they had played with defendant in the homes of their foster parents. Kimberly Brigman also described the abuse and defendant's role in it. There was ample physical evidence of abuse, including scars, loss of rugae, and muscular changes. A fellow inmate testified to sexual acts defendant claimed to have performed with the children. Defendant's daughter and step-daughter testified about the sexual abuse they endured by defendant. We cannot conclude there was a "reasonable possibility that a different result would have been reached by the jury," *id.*, had Dr. Russo's comments about Child 3's reliability not been admitted at trial. This argument is overruled.

Defendant also argues the trial court erred by admitting Dr. Conroy's testimony regarding the children's symptoms of post-traumatic stress disorder. "[E]vidence that a prosecuting witness is suffering from post-traumatic stress syndrome should not be admit-

ted for the substantive purpose of proving that a rape has in fact occurred . . . [but] it may be admitted for certain corroborative purposes." *State v. Hall*, 330 N.C. 808, 821, 412 S.E.2d 883, 890 (1992). Because the trial court gave no instruction to the jury that this testimony was to be considered for corroborative purposes, we must assume it was admitted for the substantive purpose of proving that the children had in fact been sexually assaulted. While the admission of the testimony for substantive purposes was error, we cannot conclude it had an impact on the jury's determination of defendant's guilt. As we have already determined, the evidence against defendant was overwhelming. We do not believe the jury would have reached a different verdict had Dr. Conroy not made statements regarding the children's symptoms of post-traumatic stress disorder. This argument is overruled.

**[3]** We now turn to defendant's argument that his right to a unanimous jury verdict as to each of the charges against him was violated. Defendant argues that although "there was testimony of countless acts that might qualify as criminal under the indecent liberties and sexual offense statutes . . . . [n]one of the verdict sheets set out the specific *actus reus* that the jury had to find in order to convict." Defendant relies on *State v. Gary Lawrence*, 165 N.C. App. 548, 599 S.E.2d 87 (2004), and *State v. Markeith Lawrence*, 170 N.C. App. 200, 612 S.E.2d 678 (2005), to argue the jury must be unanimous as to each specific criminal act that serves as the basis for each charge.

Since the filing of defendant's brief and oral argument in this case, the North Carolina Supreme Court has reversed both *Gary Lawrence* and *Markeith Lawrence*. *State v. Gary Lawrence*, 360 N.C. 393, 627 S.E.2d 615 (2006); *State v. Markeith Lawrence*, 360 N.C. 293, 627 S.E.2d 609 (2006). In *Markeith Lawrence*, the Supreme Court held that the indecent liberties statute does not list distinct criminal offenses in the disjunctive; rather, it "simply forbids 'any immoral, improper, or indecent liberties.'" *Markeith Lawrence*, 360 N.C. at 374, 627 S.E.2d at —— (quoting N.C. Gen. Stat. § 14-202.1(a)(1) (2005)). Therefore, under *State v. Hartness*, 326 N.C. 561, 391 S.E.2d 177 (1990), "the risk of a nonunanimous verdict does not arise," even if the jury "considered a greater number of incidents than . . . charged in the indictments," because "while one juror might have found some incidents of misconduct and another juror might have found different incidents of misconduct, the jury as a whole found that improper sexual conduct occurred." *Markeith Lawrence*, 360 N.C. at 374, 627 S.E.2d at —— (internal citation omitted). Here, as in *Markeith*

*Lawrence,* "the jury was instructed on all issues, including unanimity; [and] separate verdict sheets were submitted to the jury for each charge." *Markeith Lawrence,* 360 N.C. at 376, 627 S.E.2d at ——. Therefore, defendant's argument regarding jury unanimity is overruled.

**[4]** The trial court reviewed a number of documents and records *in camera* to determine what portion of that material defendant was entitled to in order to present a defense. The documents not turned over to defendant were sealed for appellate review. Defendant requested that this Court review the sealed documents for any exculpatory evidence which would entitle him to a new trial. Upon careful review of the records submitted under seal, we find no exculpatory evidence that would entitle defendant to a new trial. The trial court did not err in failing to turn over these records to defendant prior to trial. We find no error in the trial.

**[5]** Finally, defendant has filed a "Motion for Appropriate Relief" and an "Amended Motion for Appropriate Relief" in this Court. The "Motion for Appropriate Relief," filed on 5 July 2005, seeks a new trial for defendant on the alleged ground that Kimberly Brigman, "the only non-hearsay witness," has recanted her testimony.

Pursuant to section 15A-1418(b) of our General Statutes, when a motion for appropriate relief is filed in this Court, we "must decide whether the motion may be determined on the basis of the materials before [us], or whether it is necessary to remand the case to the trial division for taking evidence or conducting other proceedings." N.C. Gen. Stat. § 15A-1418(b) (2005); *State v. Verrier,* 173 N.C. App. 123, 131, 617 S.E.2d 675, 681 (2005) (noting that "it is more within the province of a trial court rather than an appellate court to make factual determinations"). Where there is recanted testimony,

> [a] defendant may be allowed a new trial . . . if: 1) the court is reasonably well satisfied that the testimony given by a material witness is false, and 2) there is a reasonable possibility that, had the false testimony not been admitted, a different result would have been reached at the trial.

*State v. Britt,* 320 N.C. 705, 715, 360 S.E.2d 660, 665 (1987).

Based on the record before us, we cannot determine the veracity of Kimberly Brigman's testimony. Nor can we discern whether there is reasonable possibility that a different result would have been

**STATE v. BRIGMAN**

[178 N.C. App. 78 (2006)]

reached at trial had Kimberly Brigman's testimony at trial been different or non-existent. Accordingly, we must remand the motion for Appropriate Relief based upon her alleged recantation to the trial court for an evidentiary hearing. *See, e.g., State v. Thornton*, 158 N.C. App. 645, 654, 582 S.E.2d 308, 313 (2003) ("Where the materials before the appellate court, as in this case, are insufficient to justify a ruling, the motion must be remanded to the trial court for the taking of evidence and a determination of the motion.").

[6] Defendant's second motion, filed on 4 April 2006, subsequent to oral argument, was entitled an "Amended Motion for Appropriate Relief." Rather than amending the original Motion for Appropriate Relief, however, the "amended" motion alleges new grounds for relief: ineffective assistance of counsel, and therefore constitutes a new motion for appropriate relief. Pursuant to Rule 37 (a) of our Rules of Appellate Procedure, applications for relief "may be filed and served at any time before the case is called for oral argument," N.C.R. App. P. 37(a), and compliance with the Rules of appellate procedure is mandatory. *Viar v. N.C. Dep't of Transp.*, 359 N.C. 400, 401, 610 S.E.2d 360, 360 (2005) (stating that the "North Carolina Rules of Appellate Procedure are mandatory and 'failure to follow [them] will subject an appeal to dismissal' "). Since this motion did not amend the previous motion, nor was it timely filed, "we dismiss that portion of defendant's motion for appropriate relief concerning [ineffective assistance of counsel], without prejudice to defendant to file a new motion for appropriate relief in the superior court." *Verrier*, 173 N.C. App. at 132, 617 S.E.2d at 681.

No error in the trial, Motion for Appropriate Relief remanded, Amended motion for Appropriate Relief dismissed without prejudice.

Judges HUDSON and BRYANT concur.