An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA13-1105

NORTH CAROLINA COURT OF APPEALS

Filed: 6 May 2014

STATE OF NORTH CAROLINA

v.

LARRY WAYNE ANDERSON

Onslow County
No. 11 CRS 55657-61

Appeal by defendant from judgments entered 12 April 2013 by Judge Charles H. Henry in Onslow County Superior Court. Heard in the Court of Appeals 3 February 2013.

> *Attorney General Roy Cooper, by Assistant Attorney General Linda Kimbell, for the State.*

> *Parish & Cooke, by James R. Parish, for defendant-appellant.*

HUNTER, JR., Robert N., Judge.

Defendant Larry Wayne Anderson ("Defendant") appeals from judgments entered on 12 April 2013. Defendant argues (i) the trial court erred in denying his motion to dismiss in 11 CRS 55659, (ii) the trial court violated Defendant's rights under the confrontation clause of the United States and North Carolina Constitutions, and (iii) the trial court committed plain error

in admitting certain statements by a treating physician in this child abuse case. After careful review, we find no plain error.

## I. Facts & Procedural History

On 11 September 2012 the Onslow County Grand Jury indicted Defendant on charges of felony child abuse inflicting serious mental injury ("ISMI"), felony child abuse inflicting serious bodily injury ("ISBI"), and contributing to the delinquency or other condition of a minor ("CDM") against J.H. ("Antonio")[1] and J.B. ("Corey"). The same day, Defendant was indicted on charges of accessory after the fact of child abuse and CDM against his biological daughter, K.A. ("Violet"). Defendant was also indicted on 11 September 2012 on charges of assault with a deadly weapon inflicting serious injury, ISBI, CDM, and two counts of ISMI against another stepchild, S.B. ("Benjamin"). On 13 November 2012, the Onslow County Grand Jury indicted Defendant on charges of ISMI, ISBI, and CDM against W.B. ("Dakota").[2] Defendant pled not guilty to all charges. The charges came on for trial at the 8 April 2013 session of Onslow Count Superior Court. The trial transcript tended to show the following facts.

---

[1] Pseudonyms are used to protect the identities of the children involved in this case.

[2] Collectively, we refer to all five children as "the children."

Samual Brown ("Mr. Brown") is the biological father of Benjamin, Corey, and Dakota, whom he fathered with his former wife, Mrs. Janet Anderson ("Mrs. Anderson"). Mr. Brown, an Army serviceman, was deployed to Afghanistan in February 2009. In November 2009, while Mr. Brown was still in Afghanistan, Mr. Brown and Mrs. Anderson separated. Mr. Brown paid spousal support after he and Mrs. Anderson separated.[3] Mr. Brown unsuccessfully asked Mrs. Anderson for primary custody of his children after he returned home. Mr. Brown continued placing phone calls to his children while he was deployed and after he returned home.

On 9 July 2011, Mr. Brown spoke with Benjamin over the phone. Mr. Brown said his son was "hysterical, crying." Benjamin told Mr. Brown that Defendant "tied me up and duct-taped my mouth." Mr. Brown told Benjamin to hand the phone to his ex-wife Mrs. Anderson, whom he told "I want the kids, and I want them now. That way, I can take care of them and make sure they're happy." Mr. Brown then called the Onslow County Department of Social Services ("DSS") and filed a report of abuse.

---

[3] Mrs. Anderson later married Defendant on 1 November 2010.

Mr. Brown was stationed in Alaska at the time of the phone call and made arrangements to move to Fort Bragg, where his children lived, in August 2011. When he moved to Fort Bragg, Mr. Brown's children were already in foster care, and he was able to regain custody about three weeks after moving to North Carolina. Mr. Brown also attempted to gain custody of Antonio, but was unsuccessful.

Mr. Brown noticed that his children were "different" after he regained custody of them. Mr. Brown said Benjamin was "[s]cared of anybody he didn't know," and that he would attach himself to Mr. Brown whenever Benjamin went to a new place or met new people. Mr. Brown said Benjamin was afraid of Defendant and that Benjamin thought Defendant "was going to come get him." Mr. Brown said Corey was "scared of any man, period, besides me." Benjamin, Corey, and Dakota would "[w]ake up screaming" because "they were afraid of their nightmares." Benjamin banged his head against walls, scratched himself, and jumped out of a second floor window at Mr. Brown's home. Mr. Brown said he was unable to properly care for Benjamin. Benjamin ran away from home and Mr. Brown called DSS for help. Mr. Brown then agreed to put Benjamin in foster care because he said he "couldn't help

him the way he needed to be helped." Mr. Brown remained in contact with Benjamin, calling him every week.

Mr. Brown moved to Illinois with Corey and Dakota after he was discharged under the Army's Family Care Plan. After moving to Illinois, Mr. Brown visited often with his close friend, Mr. Larry Aldrich. Mr. Brown said when Corey and Dakota first met Larry Aldrich, they "panicked" because they couldn't understand the difference between Larry Aldrich and Defendant, Larry Anderson. Mr. Brown said it took about four months for Corey and Dakota to become comfortable with anyone named Larry. Mr. Brown also said Dakota, who was four at the time of trial, only began speaking after moving from North Carolina, and began toilet training at age four. Mr. Brown said Corey remains uncomfortable around anyone she does not know and will cling to anyone familiar who is nearby.

Pediatrician Tolly Williams Garrett ("Dr. Garrett") testified next at trial. Dr. Garrett observed interviews and physical examinations of the children. Dr. Garrett said that there were "clear indicators that [Benjamin], [Antonio], [Corey], and [Violet] all had been physically abused." Dr. Garrett said the evidence of physical abuse was less clear with Dakota, but that DSS "felt like he had clearly been neglected,

as had the other four." Dr. Garrett described the harm as "severe" and repetitive with likely permanent or long-lasting effects on the five children. Dr. Garrett said "the harm came from a caregiver" which causes longer term damage than damage from an unknown person.

Dr. Garrett described DSS's interview of the children. Antonio said he "was hit across the chest by [Defendant]" with a mini-blind stick and was punished by standing in the corner with his hands behind his back and not being allowed to eat lunch. Before Antonio disclosed these details, he needed several reassurances that he could safely speak about these punishments. Antonio recounted Benjamin jumping from the second-story window. When asked why Benjamin jumped, Antonio said he thought Benjamin wanted to commit suicide. Antonio, Benjamin, and Corey said Defendant repeatedly kicked Benjamin in the genitals while bound and that Benjamin had his mouth taped shut by Defendant. Corey told her interviewer that "Daddy not like [Benjamin]."[4]

Antonio also said Corey had her mouth duct-taped as a punishment and that Defendant "attempted to attach [Corey] to a ceiling fan." Antonio said Corey was "teased or tormented with

---

[4] Several of the children referred to Defendant as "Daddy" or "Dad."

a laser light."  Dr. Garrett recounted several other details of possible abuse:

> There were reports of the children turning over a trash can to get food and then getting in trouble for that.  The children had dead bolts put on their bedroom door. They were locked in their bedrooms.  That was confirmed by Social Workers and law enforcement, that the dead bolts were on the outside of the doors; the children were locked inside the room at night, which of course, is unsafe due to fire hazard, that sort of thing, but also, they couldn't get up to go to the bathroom.
>
> There were reports of children urinating in the vents and things like that because they couldn't get out to go to the bathroom, and they were deprived of food. [Antonio]'s report clearly said the rule was, "Don't get into stuff," and, "No, we don't get lunch."

Dr. Garrett also described evidence of abuse to Dakota. She said Dakota had "multiple bruises," some of which resulted from "an incident with a dog," where Dakota was left outside and a dog wrapped its dog chain around Dakota's neck.  Dakota's physical examination found a "festering infection in his foot" and that Dakota was "noticeably developmentally delayed."

Dr. Garrett discussed interviews with an adult roommate who lived with the Andersons for a time, Alicia Everhart ("Ms. Everhart").  Ms. Everhart told her interviewers that the children were not fed enough, that their bedroom doors were

locked, and that "the house reeked of urine because the children were voiding in the vents." Ms. Everhart also told her interviewers that Benjamin was struck with the mini-blind rod, that the children were infrequently bathed, and that the children were "not allowed to go outside and play."

A neighbor, Michelle Edwards ("Ms. Edwards") told interviewers about two events that Dr. Garrett described as "concerning." The first involved

> several of the children being forced to carry weights off of a weight bar, running up and down the driveway in summer heat. She reported that when the children fell or stopped and sat down they were yanked up and yelled at to continue running. She reported this event continued in spite of the fact that Mr. and Mrs. Anderson were aware that she was watching.

Ms. Edwards also said she saw a separate event where Defendant was "carrying and throwing out furniture into a pile." Ms. Edwards described Defendant screaming next to one of the nearby children, and that Defendant proceeded to "chop up and destroy that furniture." The event seemed to involve an argument between Defendant and Mrs. Anderson. From the evidence collected, Dr. Garrett concluded that Antonio, Benjamin, Corey, and Dakota all suffered emotional harm from their interactions with Defendant, specifically saying that DSS "characterized that

we felt like the children had suffered at both the hands of Mrs. Anderson and [Defendant] separately, as well as together." Dr. Garrett recommended treatments and that Defendant have no contact with any of the children.

Mr. Brown took his children to two psychologists on Fort Bragg's campus; Dr. Sharon Cooper ("Dr. Cooper") and Ms. Linda Giles, who both testified at trial. Dr. Cooper, a developmental and forensic pediatrician, diagnosed Benjamin as physically abused, neglected, and psychologically maltreated. Dr. Cooper also opined that Benjamin suffered from post-traumatic stress disorder and insomnia. Dr. Cooper further opined that Corey and Dakota suffered from severe psychological problems.

Ms. Giles is a child therapist at Fort Bragg who treated Corey and Dakota. Ms. Giles said Corey and Dakota "were the worst children I had seen at Fort Bragg at that point, with the symptoms they had, both psychologically and physically." Ms. Giles said the children were malnourished, had distended stomachs, thin hair, thin bone structure, that they had worms, that their digestive systems were "not working properly," and that their "eating and defecating was -- was a problem."

Psychologist Laurie Hawkins ("Ms. Hawkins") testified next at trial. Ms. Hawkins also worked with Benjamin and diagnosed

him with post-traumatic stress disorder and attention deficit hyperactivity disorder. Ms. Hawkins completed a "trauma narrative" with Benjamin, which is a therapeutic device designed to allow a child to tell their story. In this exercise, Benjamin would say a sentence telling his life story and then stop to allow Ms. Hawkins to record his statements. Ms. Hawkins then would read the statements back to Benjamin, as well as to his foster mother. Ms. Hawkins read aloud Benjamin's narrative, which said

> Hi. My name is [Benjamin]. I am six years old. I live with Ms. Fieena Terree(phonetic), and Taylor. I like my home because it has fantastic stuff to play with. Ms. Fieena cooks good. My favorite is spaghetti and Oodles of Noodles and hot dogs. I live here because I got treated bad in my other home with Larry and Janet. I hate them a lot because they spanked me every day.
>
> . . . .
>
> When I lived with Larry and Janet, Larry spanked me. He does to me and [Antonio] and [Corey] and [Dakota]. He puts all of us in the same room because we were bad, and locked us in. We would try to get out. Me and [Antonio] found a secret way to get out, out the window. Larry is at work and Janet is asleep. He tied my arms and legs up. I rolled to the window and got untied. I went out the window and broke into Janet's room and sneaked in the kitchen and got food. Me and my brothers and sister ate the food and we all sneaked out. Larry hit me in my

face. I was thinking, "I am super-mad at Larry," and I hated him. One time he tied me up and taped my mouth for a long time until I got strong. I was thinking I wanted to punch him in the stomach. Janet knew he taped my mouth. Janet let him do it. One time Janet pushed Larry on me. Larry was very superbad. Janet was just a little bad. Larry is in jail and the policeman is next to the gate so he can't get out. He is in jail because he spanked me and that's called bad. Child abuse. Janet is in jail because she is bad and hurt us. It was not my fault. It was the grown-ups' fault. I have learned in therapy to tell Ms. Lorri about my feelings. I am always happy every time I come.

Nancy Johnson ("Ms. Johnson") testified next for the State. Ms. Johnson is a social worker and worked with Antonio in Jacksonville in 2012. Ms. Johnson started working with Antonio after he had been removed to foster care and said she was attempting to help Antonio testify in the case. Ms. Johnson said Antonio's symptoms began to increase when the subject of testifying was discussed, that he began to soil his bed and have nightmares. Antonio expressed fear of Larry to Ms. Johnson, saying "[t]hey'll get me. It doesn't matter what anybody does. They'll get me."

Gerald and Michelle Edwards, the Andersons' neighbors testified at trial and recounted the two incidents discussed at the earlier interview with DSS. Defendant's former roommate,

Ms. Everhart testified next. Ms. Everhart stated that she saw the children being hit with the mini-blind rod and being thrown around. Ms. Everhart said Defendant hit Benjamin "[m]aybe twice a day, depending on the situation of what was going on" and that Defendant hit Benjamin nearly every day. Ms. Everhart said Defendant became enraged when Antonio and Benjamin got into a trashcan at the home, hitting both children with the mini-blind rod. Ms. Everhart said she saw Defendant and Mrs. Anderson lock the children in their bedroom and that they were not allowed to leave the room to use the bathroom or for any reason.

Ms. Everhart also recounted that Benjamin and Antonio once "emptied the trash and brought it into [their] bedroom and dumped it out all over the floor and they were eating out of the trash can." Ms. Everhart said the Andersons punished Benjamin and Antonio for this, making them clean up the trash and hitting them. Ms. Everhart also said that while she lived with the Andersons, all five of their children lived in the same room that had a deadbolt lock. Ms. Everhart moved out of the Anderson residence because the fighting and violence between Defendant and Mrs. Anderson continued to escalate.

Tina Morris ("Ms. Morris"), a social worker with Onslow County DSS, testified. Ms. Morris arrived at the Andersons'

home after receiving a request to perform a family assessment from Antonio's school. After Ms. Morris arrived, Antonio returned from school, lifted his shirt, and showed Ms. Morris a scar on his chest and his arm. When Ms. Morris asked who gave him the scar, Antonio pointed to Defendant. Defendant was present at the meeting and said "Who me?" Mrs. Anderson said "No" and looked at Antonio. Antonio then said a child at school gave him the scar.

Prior to Antonio getting home, Defendant told Ms. Morris that Benjamin and Antonio were fighting, and that Benjamin had hit Antonio with the mini-blind rod. Ms. Morris also said Corey had a bruise on her cheek, which she said she had due to a fall at a McDonalds. Ms. Morris performed a follow up interview at Antonio's school a week later. Antonio told Ms. Morris about the trash incident and that Defendant hit him with a mini-blind rod. Ms. Morris took photographs of Antonio's injuries.

Jamie Johnson ("Ms. Johnson") testified next at trial. Ms. Johnson was a DSS Investigator who was sent to the Andersons' home on 13 July 2011. Ms. Johnson spoke with the children and said that Benjamin told her his mouth had been duct-taped and that his wrists and ankles were tied behind his back in his bedroom. Antonio said Benjamin was tied up and that "when he's

tied, he gets kicked in the nuts and pecker." The children also recounted being locked in their room, being spanked, and being bound. Ms. Johnson also said the children's room did not have a doorknob, and that the room could be secured by its exterior locking deadbolt. Ms. Johnson said there were exterior locks on the windows in the children's room and that the home smelled of urine. Based on her observations, Ms. Johnson called her supervisor and asked Defendant to leave the home that evening. The children were taken to the Child Advocacy Center on 25 July 2011 and were thereafter placed in foster care.

The State next called Matthew Herring ("Mr. Herring"), who lived with Defendant in 2010. Mr. Herring testified about the mini-blind rod incident, saying "[Defendant] went in and I heard a loud pop, and he came back with a curtain rod in his hand. And then [Benjamin] came out with a -- crying, and had a welt on his left side on his arm and his chest. Mr. Herring said that Defendant punished his children "a little bit more excessive[ly] than what should have been." Mr. Herring said Defendant would pin Benjamin and Antonio's hands behind their back, sit on their back, and place them face down in pillows to keep them from screaming.

Onslow County Social Worker Scottie Hampton ("Mr. Hampton") was the State's final witness. Mr. Hampton said he was assigned to work with the children on 12 September 2011. Mr. Hampton first met Corey and Dakota in foster care on 30 August 2011 and said they were anxious and looked pale during the visit. Benjamin was also present and needed encouragement that he would be safe. Mr. Hampton described Benjamin's fears and need to "escape," such as not being able to close doors and a desire to exit rooms through windows. Mr. Hampton said Benjamin required extensive supervision and care, ultimately requiring a transition into a therapeutic foster home to meet his needs. Mr. Hampton also said that Violet and Antonio were placed into traditional foster care homes.

The State rested its case. The State dismissed the charges of ISBI in 11 CRS 55657 (concerning Corey), 11 CRS 55658 (concerning Antonio), and 11 CRS 55659 (concerning Dakota). Defendant requested that the trial court dismiss the ISMI charge and CDM charge in those three cases, which was denied. In 11 CRS 55660 (concerning Violet), the State dismissed the accessory after the fact to a felony charge. Defendant moved to dismiss the CDM charge in 11 CRS 55660, which the trial court denied. In 11 CRS 55661 (concerning Benjamin), the charge of assault

with a deadly weapon inflicting serious injury and one of the two ISMI charges were dismissed. Defendant moved to dismiss the ISBI charge, the second ISMI charge, and the CDM charge. The trial court denied Defendant's motion.

Defendant testified at trial. Defendant said he was a caregiver to the children and said "I did spank the kids. I believe in corporal punishment. I was spanked as a child. So I would use a belt, a hand, a flip flop. I even spanked the children with a blind rod on their butts before. So, I mean, I believe in spankings to correct the child when there's a problem." Defendant said he spanked Benjamin from once a day to two times a day, depending on his behavior. Defendant also said he was abused as a child by his biological father and that his father used his "hand, belt, a switch, anything he could find." Defendant said he was dishonest with social workers who came to his home because he was afraid "of being told that I was just like [Defendant's father]" and that he was afraid people would say he was abusive.

Defendant said Antonio and Benjamin "had gotten into the trash one day and I sat there and went to the room and proceeded to spank [Antonio] with the blind rod." Defendant said he

usually spanked the children on the [b]utts," but that he may have accidentally hit the child on the chest.

Defendant discussed his issues with Benjamin, saying Benjamin "was more difficult. When I first met him and everything, I knew he had issues. Me and Janet had arg -- talked about that and things of that nature." Defendant said he had to spank Benjamin more than the others. Defendant said Benjamin had a problem of hitting his brothers and sisters, necessitating punishment. Defendant testified that he had "popped [Benjamin] in the mouth" and that he hit Antonio in the mouth on accident.

Defendant said he never sat on the children except times where he was "playing around." Defendant also said "there was plenty of food in the house." Defendant said he and Mrs. Anderson "had to put locks on the door" because the "kids were getting into things" and to keep the children safe. Defendant locked the children in their room every night until he had to go to work. Defendant also said that the children wet the bed and that the couple tried to use plastic liners to protect the mattresses, but that the children would play with the plastic bed lining. Defendant attributed the home's urine or fecal smell to the family dog. Defendant also said he did not kick

any of the children in the genitals on purpose. Defendant said he did not physically abuse the children, but that he felt "kind of bad" about the mini-blind rod incident. Defendant denied making the children run up and down the driveway carrying weights.

After testifying, Defendant renewed his motions to dismiss, which were denied. The jury found Defendant guilty of all the remaining charges not previously dismissed, except a finding that Defendant was guilty of the lesser-included charge of misdemeanor child abuse rather than felony child abuse in 11 CRS 55659. The trial court entered a judgment sentencing Defendant to an active sentence of 100 to 147 months in prison. Defendant gave notice of appeal in open court on 12 April 2013.

## II. Jurisdiction & Standard of Review

Defendant appeals as of right from a decision of the trial court. N.C. Gen. Stat. §§ 7A-27(b), 15A-1444(a) (2013).

Defendant first argues that the trial court erred in denying his motion to dismiss in 11 CRS 55659. "This Court reviews the trial court's denial of a motion to dismiss *de novo*." *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007). "The test to be applied in ruling on a defendant's motion to dismiss is whether the State has produced substantial

evidence of each and every element of the offense charged, or a lesser-included offense, and substantial evidence that the defendant committed the offense." *State v. Chamberlain*, ___ N.C. App. ___, ___, 753 S.E.2d 725, 729 (2014). "If substantial evidence exists supporting [the] defendant's guilt, the jury should be allowed to decide if the defendant is guilty beyond a reasonable doubt." *State v. Fowler*, 353 N.C. 599, 621, 548 S.E.2d 684, 700 (2001), *cert. denied*, 535 U.S. 939 (2002).

Defendant moved to dismiss a charge of felony child abuse at trial in 11 CRS 55659 at the close of the State's evidence and at the trial's conclusion. The jury was instructed on the charge of misdemeanor child abuse and Defendant did not object to the jury instructions. Defendant did not move to set aside the verdict finding him guilty of misdemeanor child abuse.

The State argues that because Defendant did not move to set aside the verdict or object to the misdemeanor child abuse jury instruction, the present case is not properly before this Court. We disagree and hold that Defendant preserved the issue via his motion to dismiss at trial. *See State v. Powell*, 299 N.C. 95, 98, 261 S.E.2d 114, 117 (1980) ("Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the

offense charged, *or of a lesser offense included therein*, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied."(emphasis added)).

Under *de novo* review, we examine the case with new eyes. "[*D*]*e novo* means fresh or anew; for a second time, and an appeal *de novo* is an appeal in which the appellate court uses the trial court's record but reviews the evidence and law without deference to the trial court's rulings." *Parker v. Glosson*, 182 N.C. App. 229, 231, 641 S.E.2d 735, 737 (2007) (quotation marks and citations omitted). "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *Craig v. New Hanover Cnty. Bd. of Educ.*, 363 N.C. 334, 337, 678 S.E.2d 351, 354 (2009) (quotation marks and citation omitted).

Defendant next argues the trial court committed plain error by violating his constitutional right to cross-examine witnesses. Defendant did not object to this issue at trial, nor does he seek review under Rule 2 in his brief. "[A] party's failure to properly preserve an issue for appellate review ordinarily justifies the appellate court's refusal to consider the issue on appeal." *Dogwood Dev. & Mgmt. Co. v. White Oak Transp. Co.*, 362 N.C. 191, 195–96, 657 S.E.2d 361, 364 (2008).

Appellate courts may suspend the requirements of the Rules of Appellate Procedure when necessary to "prevent manifest injustice to a party." N.C. R. App. P. 2. Such suspensions must be made cautiously, and only in exceptional circumstances. See *Dogwood*, 362 N.C. at 196, 657 S.E.2d at 364. Because Defendant does not invoke Rule 2 in his brief and based on our review of the record and transcripts, we refrain from invoking Rule 2, as we do not find that reviewing Defendant's assignment of error would prevent manifest injustice. Accordingly, Defendant's second assignment of error is without merit.

Defendant's third and fourth assignments of error concern admission of testimony into evidence. Both challenged statements were not objected to at trial. "When an issue is not preserved in a criminal case, we apply plain error review." *State v. Streater*, 197 N.C. App. 632, 639, 678 S.E.2d 367, 372 (2009). Plain error is explained in *State v. Lawrence*, 365 N.C 506, 723 S.E.2d 506 (2012):

> For error to constitute plain error, a defendant must demonstrate that a fundamental error occurred at trial. To show that an error was fundamental, a defendant must establish prejudice that, after examination of the entire record, the error had a probable impact on the jury's finding that the defendant was guilty. Moreover, because plain error is to be applied cautiously and only in the

> exceptional case, the error will often be one that seriously affects the fairness, integrity or public reputation of judicial proceedings.

*Id.* at 518, 723 S.E.2d at 334 (quotation marks and citations omitted). Plain error is "normally limited to instructional and evidentiary error." *Lawrence*, 365 N.C. at 516, 723 S.E.2d at 333. As assignments of error three and four are evidentiary, plain error review is appropriate.

### III. Analysis

### A. Motion to Dismiss

Defendant was charged with felony child abuse under N.C. Gen. Stat. § 14-318.4(a) (2013), which provides

> A parent or any other person providing care to or supervision of a child less than 16 years of age who intentionally inflicts any serious physical injury upon or to the child or who intentionally commits an assault upon the child which results in any serious physical injury to the child is guilty of a Class D felony, except as otherwise provided in subsection (a3) of this section.

"Serious physical injury" is defined by the statute as "[p]hysical injury that causes great pain and suffering. The term includes serious mental injury." N.C. Gen. Stat. § 14-318.4(d)(2) (2013).

Synthesizing the statute into elements, there must be a (i) parent or other caregiver (ii) supervising a child under 16 that

(iii) intentionally (iv) inflicts (v) serious physical injury or commits an assault on the child. We are only concerned with elements three, four, and five. Taken in the light most favorable to the State, substantial evidence shows those elements are met.

After leaving Defendant's custody, Dakota was fearful of many individuals whom he came into contact with. When Dakota was almost three, he was not toilet trained and could not speak. Dr. Garrett testified that Dakota was deprived of food and exhibited extreme developmental delays. Dr. Garrett said Dakota had a foot infection when she saw him. Dr. Garrett said Dakota had bruises around his neck, apparently from a dog chain being wrapped around it. Dr. Cooper testified that Dakota was significantly developmentally delayed, including an inability to use utensils, to pick up food with his hands, or to walk. Ms. Giles testified that Dakota was malnourished with thin hair and bone structure, had worms, and had a malfunctioning digestive system. Ms. Giles said Dakota could not speak, was not toilet trained, and had diarrhea so severe that it required medical attention. Ms. Everhart testified that she saw Defendant pick Dakota up and throw him around. Defendant testified that he ensured that all of the children, including Dakota, were locked

in their room at night. Defendant admitted to hitting his children with whatever was close by, although he did say that he did not discipline Dakota often. The foregoing, amongst other testimony, provides substantial evidence of the later three elements, making the trial court's denial of Defendant's motion to dismiss proper.

## B. Plain Error

Defendant next argues that the trial court committed plain error by allowing Dr. Garrett's testimony that the children were harmed by a caregiver and that the harm came from Defendant and Mrs. Anderson, separately and together. We disagree.

Dr. Garrett testified that the examinations performed at the child advocacy center led her and her team to believe that "all five of the children had been subjected to repeated physical abuse and neglect." Dr. Garrett described the abuse as severe and causing long-lasting damage to the children. Dr. Garrett said that "the harm came from a caregiver" and that "if children are abused by a caregiver, that is more damaging to the child long-term than damage that comes from an unknown person." At the close of Dr. Garrett's testimony, she stated that "[w]e characterized that we felt like the children had suffered at both the hands of Mrs. Anderson and [Defendant] separately, as

well as together."  Defendant did not object to any of these statements at trial.

In *State v. Stancil*, 355 N.C. 266, 559 S.E.2d 788 (2002), the Supreme Court held *per curiam* that it was not plain error to admit an expert opinion that a victim had in fact been sexually abused absent a proper foundation where there was "overwhelming" evidence of the defendant's guilt, including symptoms of sexual abuse five days after the incident and intense and immediate emotional trauma after the incident.  *State v. Stancil*, 146 N.C. App. 234, 240, 552 S.E.2d 212, 215-16 (2001), *per curiam modified and aff'd*, 355 N.C. 266, 559 S.E.2d 788.  As such, because the evidence was "overwhelming" in that case, any error in admitting improper expert opinion did not amount to plain error.  *Id.*

*State v. Brigman*, 178 N.C. App. 78, 632 S.E.2d 498 (2006), also involved plain error review and held that a physician's statement "that these children suffered sexual abuse" perpetrated by the defendant was improper.  *Id.* at 91-92, 632 S.E.2d at 507.  However, this Court again found the other evidence against the defendant in *Brigman* was overwhelming and concluded that the second prong of the plain error standard, that there was not a "reasonable possibility that a different

result would have been reached by the jury." *Id.* (citation and quotation marks omitted).

Defendant cites several cases to support his argument that Dr. Garrett's testimony was improper expert testimony of Defendant's guilt. *See State v. Wilkerson*, 295 N.C. 559, 247 S.E.2d 905 (1978); *Brigman*, 178 N.C. App. 78, 632 S.E.2d 498; *State v. Figured*, 116 N.C. App. 1, 446 S.E.2d 838 (1994); *State v. Huang*, 99 N.C. App. 658, 394 S.E.2d 279, *disc. review denied*, 327 N.C. 639, 399 S.E.2d 127 (1990). Defendant's reliance on these authorities is misplaced.

In *Wilkerson*, the Supreme Court held that the physician did not express any opinion of the defendant's guilt or innocence. 295 N.C. at 570, 247 S.E.2d at 911 ("Nowhere in the record did either physician express or purport to express an opinion as to defendant's guilt or innocence."). The Supreme Court cautioned that the physicians in that case should not have been allowed to testify that the victim's injury was caused by any particular activity or class of activities. *Id.* However, the evidence disputed in that case was not reviewed under the plain error standard, nor were the results in *Figured* or *Huang*. *Id.*; *Figured*, 116 N.C. App. at 8, 446 S.E.2d at 843 (holding that expert opinion testimony was inadmissible without engaging in

plain error review); *Huang*, 99 N.C. App. at 666, 394 S.E.2d at 284 (holding that a psychologist's testimony that "explicitly implicated" the defendant was erroneously admitted without engaging in plain error review). As such, while these cases found that expert testimony was improperly allowed, the cases did not consider whether admission of that evidence created a probable effect upon the verdict, as required under plain error review.

Here, the situation is analogous to *Stancil* and *Brigman*. While it was error for Dr. Garrett to state that harm was perpetrated by a caregiver and that Defendant had harmed the children, we find there was "overwhelming evidence" to suggest that there was not a reasonable probability that a different result would have been reached by the jury. The State presented twelve witnesses at trial, amongst whom included pediatricians, social workers, therapists, the biological father of three of the children, two neighbors, and two of Defendant's roommates. These witnesses provided extensive evidence, interviews, eyewitness accounts, and documentation of abuse by Defendant, catalogued at length *supra*. For example, Defendant's roommate Ms. Everhart testified that Defendant locked his children in their bedroom and told her not to release them. Ms. Everhart

said Defendant threw Dakota around, that he hit Benjamin as much as twice a day, and that he struck Benjamin and Antonio with a mini-blind rod on the chest. Extensive evidence was presented concerning the children's malnourishment, the smell of urine in the home, and other incidents of abuse. Further, Defendant admitted to striking his children and locking the five children in a single bedroom nightly. As such, overwhelming evidence existed showing that admission of Dr. Garrett's testimony would not have a probable impact on the jury's verdict, and Defendant's argument is overruled.

## IV. Conclusion

For the reasons stated above, we find

NO PLAIN ERROR.

Chief Judge Martin and Judge ELMORE concur.

Report per Rule 30(e).