IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA15-333

 Filed: 15 March 2016

Cabarrus County, Nos. 10 CRS 51320–26

STATE OF NORTH CAROLINA

 v.

REID WILBURN MCLAUGHLIN

 Appeal by defendant from orders entered 22 October 2014 by Judge Jeffrey P.

Hunt in Cabarrus County Superior Court. Heard in the Court of Appeals 6 October

2015.

 Attorney General Roy Cooper, by Assistant Attorney General Anne M. Middleton
 and Assistant Attorney General Mary Carla Babb, for the State.

 Marilyn G. Ozer for defendant-appellant.

 BRYANT, Judge.

 Where decedent’s statements were admitted at trial for the primary purpose

of obtaining a medical diagnosis, and not for the primary purpose of creating an out-

of-court substitute for trial testimony, the Confrontation Clause of the Sixth

Amendment is satisfied, and the trial court committed no error. Additionally, the

trial court did not err in admitting out-of-court statements under the excited

utterance exception to the hearsay rule. Finally, we find no plain error where the

trial court admitted relevant testimony, and where there was otherwise

overwhelming evidence to support the jury verdict.
 STATE V. MCLAUGHLIN

 Opinion of the Court

 Defendant sexually molested the victim, Preston,1 over a period of

approximately five to six years, starting when the victim was about nine or ten years

old and ending when he was fifteen. Defendant did so at Preston’s home, at

defendant’s home, and when taking Preston on outings and vacations to various

places.

 Preston was born on 22 August 1994 and was one of seven children. Preston’s

mother, Rebekah, described Preston at trial as a smart, funny, and caring child, who

changed when he was approximately nine years old, in that he became sadder and

anxious and began to isolate himself.

 Rebekah met defendant while he was serving time in the same prison as her

brother at the Quincy Correctional Institution in Tallahassee, Florida. Upon his

release, defendant developed a close relationship with Preston’s family and became

known as “Uncle Doug.” Beginning in 2003 or 2004, defendant took Preston several

places, including trips to baseball games in Florida; to Massachusetts, Vermont, and

Pennsylvania; to places in the North Carolina mountains for snowboarding; and to

Daytona, Florida during Preston’s spring breaks.

 Defendant first sexually molested Preston after taking him to a baseball game

in 2003 or 2004, when Preston was approximately nine years old. At that time,

defendant gave Preston alcohol and touched him on his private parts. Starting when

 1 A pseudonym will be used throughout as the victim was a minor when the abuse occurred.
N.C. R. App. P. 3.1(b) (2015).

 -2-
 STATE V. MCLAUGHLIN

 Opinion of the Court

Preston was ten, defendant engaged Preston in oral sex, and starting when Preston

was twelve, defendant began having anal sex with Preston. Defendant bought

Preston anything he wanted, including video game consoles, a television,

snowboarding gear, and clothing, as bribes for performing sex acts with defendant.

 In July 2008, when Preston was thirteen, he and his family moved to Concord,

North Carolina. That same year, defendant lost his job and his home. Beginning in

March 2009, Rebekah allowed defendant to live with her family, helped him look for

jobs, and assisted him financially. While living with Preston and his family,

defendant helped care for Preston and continued to take him on trips. During some

period of the time defendant lived with Preston’s family, he shared a room with

Preston. According to Rebekah, in October 2009, Preston indicated that he did not

want defendant living in the house. In the fall or winter of 2009, defendant moved

out but continued to take Preston on trips.

 On 5 March 2010, defendant took Preston on a trip to Florida during his spring

break. The night before, on 4 March 2010, defendant engaged Preston in performing

fellatio. On their way to Florida, defendant and Preston spent the night in

Brunswick, Georgia, where defendant attempted anal intercourse with Preston, but

was unable to do so. From Brunswick, defendant and Preston traveled to Tampa,

Florida. Thereafter, Preston spent the remainder of his spring break with his father

in southern Georgia.

 -3-
 STATE V. MCLAUGHLIN

 Opinion of the Court

 While staying with his father, Preston emailed his father and told him about

the abuse, but his father did not check his email before Preston returned to North

Carolina with defendant. On 14 March 2010, while Preston was riding home with

defendant, he texted his mother: “As soon as I get home, we need to go for a drive.”

Rebekah explained that this was code that an important issue needed to be discussed

privately. According to Rebekah, when Preston arrived home, he rushed into her

room and told her, “We got to go now.” At trial, Rebekah testified that when she and

Preston went for their drive, he was very shaken and upset, and he seemed very

nervous and scared. Upon being prompted by Rebekah, Preston told her that

defendant had been “touching [him] inappropriately on [his] private parts and –

more.” Rebekah and Preston were both crying. When Rebekah asked what “more”

meant, Preston told her that it meant he and defendant had oral sex. Preston also

told Rebekah that defendant told Preston he would kill him and his entire family if

he disclosed any of the abuse.

 Worried about Preston as well as about her other children who were at home

with defendant at the time, Rebekah drove to the Concord Police Department, where

she and Preston spoke with Detective Carlos Landers, who was assigned to

investigate the case. Detective Landers then went to Preston’s home and told

defendant that the family wanted him to leave. Defendant complied and voluntarily

went to the police department where he spoke with Detective Landers.

 -4-
 STATE V. MCLAUGHLIN

 Opinion of the Court

 On 26 March 2010, Preston had an appointment at the Children’s Advocacy

Center (“CAC”), a department of the Jeff Gordon Children’s Hospital in Carrabus

County. CAC staff met with Preston to conduct a medical interview and give him a

complete medical evaluation. Registered nurse Martha Puga conducted the interview

portion of Preston’s evaluation, which she videotaped. The recording became part of

Preston’s medical file. A DVD copy and transcript of Preston’s interview were entered

into evidence at trial over defendant’s objection. During his interview with Nurse

Puga, Preston recounted, among other things, details of the sexual abuse inflicted

upon him by defendant, places where defendant molested him, and things defendant

bought him in exchange for performing sex acts. Preston also told Nurse Puga that

he was afraid of defendant, noting that when defendant got mad, he would become

extremely violent and throw things across the room, and that on a few occasions,

defendant picked Preston up by the hair and threw him on the bed.

 The doctor who performed Preston’s medical examination, Rosolena Conroy,

M.D., testified at trial that an abused child’s biggest fear is of the perpetrator and

that, more specifically, the child fears the perpetrator will hurt him. Dr. Conroy noted

that delayed disclosure of abuse was very common as, in order to make disclosures of

sexual abuse, victims must overcome fear, obligation, guilt, and shame. She also

testified that a disproportionately high number of child victims of sexual abuse go on

 -5-
 STATE V. MCLAUGHLIN

 Opinion of the Court

to commit suicide and that these children experience a greater risk of abusing drugs

and alcohol.

 Dr. Conroy testified that it was her practice to first speak to the nurse about

the history the nurse obtains, then to do a complete physical examination of the child.

Dr. Conroy’s assessment of Preston showed that his history was “extremely clear,

concise, and detailed.” Dr. Conroy testified that Preston’s physical exam was normal,

which was not surprising and “very, very common.” According to her, the lack of

physical findings “did not negate his clear history of repeated sexual abuse.”

 On 19 April 2010, warrants were issued for defendant’s arrest, charging him

with five counts of statutory sexual offense and two counts of taking indecent liberties

with a minor. However, they were not served on him until 30 March 2011 because

defendant had left the State and gone to Florida. Defendant was indicted on 11 April

2011 for five counts of statutory sex offense and for two counts of taking indecent

liberties with a minor.

 After Preston made his disclosure of sexual abuse, he began having night

terrors and punching holes in the walls. He kept knives under his bed and bats

strategically placed around his room. Rebekah sought treatment for Preston at

various facilities. Issues regarding Preston which Rebekah wanted addressed

included (1) a suicide attempt by Preston; (2) physical violence at home (punching

holes in the walls); (3) stealing from his parents; (4) loss of academic potential; (5)

 -6-
 STATE V. MCLAUGHLIN

 Opinion of the Court

hanging around “drug people”; (6) sneaking out; (7) verbal abuse at home; (8) getting

kicked out of school; (9) self-injurious behavior, such as cutting; and (10) criminal

activity and legal problems, including a misdemeanor charge for possession of drug

paraphernalia which was ultimately dismissed because of Preston’s age.

 In April 2010, Rebekah took Preston to see a licensed professional counselor,

Susan Sikes, who saw him until April 2011. Sikes testified, among other things, that

Preston indicated that he was sexually abused from age nine to fifteen, that it

occurred for six years, and that it was the most significant trauma he had ever faced.

Sikes also testified that Preston had checked “suicidal ideation” on his intake form

and that he told her about one suicide attempt where he ingested white powder from

a fluorescent light bulb.

 In June 2012, when Preston was seventeen, Rebekah enrolled him in two in-

patient facilities, the last of which was in California. There, the resident

psychologists specialized in trauma and focused their treatment of Preston on his

sexual abuse. After thirty days in the facility, on 6 July 2012, Preston committed

suicide by hanging himself.

 On 25 April 2014, a pretrial hearing was held regarding the State’s motion to

admit the victim’s videotaped CAC interview and statements the victim made to his

mother. Defendant objected based on hearsay and Confrontation Clause grounds.

On 31 July 2014, the trial court entered a written order, ruling that the victim’s

 -7-
 STATE V. MCLAUGHLIN

 Opinion of the Court

videotaped statements and statements to his mother would be admitted as exceptions

to the hearsay rule.

 The case came on for trial during the 13 October 2014 session of Cabarrus

County Superior Court, the Honorable Jeffrey P. Hunt, Judge presiding. In addition

to evidence of sexual abuse, the State submitted evidence that Preston committed

suicide. Sikes testified about peer-reviewed articles and studies which indicated that

there was a correlation between suicide and sexual abuse, that the risk of suicide

increases with male victims, that the risk also increases with penetration, and that

the risk is even higher when the perpetrator is a friend, family member, or person

close to the victim. Sikes testified that based upon her experience and research

Preston’s disclosure of sexual abuse “certainly could be a factor in his suicide.”

 Preston’s younger half-brother, Jonah,2 also testified at trial that on three

occasions defendant touched his penis by wrapping his fingers around it and moving

his hand up and down. After the second time, defendant told Jonah that if he told

anyone about what happened, defendant would hurt him. Jonah did not tell anyone

at the time the abuse happened because he believed defendant’s threats and was

scared.

 2 A pseudonym will be used as the victim was a minor when the abuse occurred. N.C. R. App.
P. 3.1(b).

 -8-
 STATE V. MCLAUGHLIN

 Opinion of the Court

 Defendant testified at trial on his own behalf and denied that he at any time

threatened Preston or engaged in any sexual activity with or inappropriate touching

of Preston or his half-brother Jonah.

 On 22 October 2014, the jury found defendant guilty on all counts. As a prior

record level IV, the trial court sentenced defendant to consecutive sentences of a

minimum of 339 months and a maximum of 416 months for each of the five counts of

statutory sex offense. Defendant was sentenced to a minimum of 25 months and a

maximum of 30 months on each of the two counts of taking indecent liberties with a

minor, to run consecutively with the statutory sex offense sentences. The trial court

found that defendant was convicted of a criminal offense requiring sex-offender

registration and imposed satellite-based monitoring for a period of thirty years after

his release from prison. Defendant appeals.

 __________________________________________________________

 On appeal, defendant argues that (I) allowing the jurors to use Preston’s CAC

interview in lieu of live testimony violated defendant’s constitutional right to

confrontation; (II) the trial court erred when it admitted Preston’s statements to his

mother under the excited utterance exception to the hearsay rule; and (III) the trial

court erred when it denied defendant’s motion to exclude the State from introducing

evidence linking the suicide of Preston to acts of defendant.

 -9-
 STATE V. MCLAUGHLIN

 Opinion of the Court

 I

 Defendant first argues that his constitutional right to confront his accuser was

violated when the trial court allowed into evidence Preston’s interview at the CAC in

lieu of his live testimony. Specifically, defendant complains that the CAC interview

violates the Confrontation Clause because the “primary purpose” of Preston’s CAC

interview was to verify abuse for the purpose of later prosecution and was, therefore,

testimonial and inadmissible hearsay evidence. We disagree.

 The Confrontation Clause provides that “[i]n all criminal prosecutions, the

accused shall enjoy the right . . . to be confronted with the witnesses against him.”

U.S. Const. amend. VI. “The right to confront one’s accusers is a concept that dates

back to Roman times[,]” but the roots of the Sixth Amendment are generally traced

back to English common law. Crawford v. Washington, 541 U.S. 36, 43, 158 L. Ed.

2d 177, 187 (2004) (citations omitted). Upon its inception, the Sixth Amendment was

primarily geared towards “prevent[ing] depositions or ex parte affidavits, such as

were sometimes admitted in civil cases, being used against the prisoner in lieu of a

personal examination and cross-examination of the witness . . . .” Mattox v. United

States, 156 U.S. 237, 242, 39 L. Ed. 409, 411 (1895); see also Crawford, 541 U.S. at

43–50, 158 L. Ed. 2d at 187–92 (providing a thorough historical background of the

Confrontation Clause); State v. Webb, 2 N.C. 103, 103–04 (Super. L. & Eq. 1794) (per

curiam) (holding that where defendant was on trial for horse-stealing depositions

 - 10 -
 STATE V. MCLAUGHLIN

 Opinion of the Court

taken in his absence were not permitted to be read against him: “no man shall be

prejudiced by evidence which he had not the liberty to cross examine”).

 With regard to the advent of the hearsay rule, “[b]etween 1700 and 1800 the

rules regarding the admissibility of out-of-court statements were still being

developed.” Crawford, 541 U.S. at 73, 158 L. Ed. 2d at 206. Even Justice Scalia, the

author of the majority opinion in Crawford and well-known for his originalist position

when it comes to constitutional interpretation, acknowledged that “[t]here were

always exceptions to the general rule of exclusion . . . . It is one thing to trace the

right of confrontation back to the Roman Empire; it is quite another to conclude that

such a right absolutely excludes a large category of evidence.” Id. Indeed,

 [e]xceptions to confrontation have always been derived
 from the experience that some out-of-court statements are
 just as reliable as cross-examined in-court testimony due
 to the circumstances under which they are made. . . . [F]or
 example, . . . [b]ecause [co-conspirator] statements are
 made while the declarant and accused are partners in an
 illegal enterprise, the statements are unlikely to be false
 and their admission actually furthers the Confrontation
 Clause’s very mission which is to advance the accuracy of
 the truth-determining process in criminal trials. . . .
 Similar reasons justify the introduction of . . . statements
 made in the course of procuring medical services . . . . That
 a statement might be testimonial does nothing to
 undermine the wisdom of one of these exceptions.

Id. at 74, 158 L. Ed. 2d at 206–07 (emphasis added) (internal citations and quotation

marks omitted).

 - 11 -
 STATE V. MCLAUGHLIN

 Opinion of the Court

 While it is well-established that there is “wisdom” to these hearsay exceptions,

see id., it is similarly settled that, while “the Confrontation Clause and rules of

hearsay may protect similar values, it would be an erroneous simplification to

conclude that the Confrontation Clause is merely a codification of hearsay rules.”

State v. Jackson, 348 N.C. 644, 649, 503 S.E.2d 101, 104 (1998) (citing California v.

Green, 399 U.S. 149, 155, 26 L. Ed. 2d 489, 495 (1970)). “Evidence admitted under

an exception to the hearsay rule may still violate the Confrontation Clause.” Id.

(citation omitted); see also Crawford, 541 U.S. at 51, 158 L. Ed. 2d at 192 (“[E]x parte

examinations might sometimes be admissible under modern hearsay rules, but the

Framers certainly would not have condoned them.”).

 At the same time, the U.S. Supreme Court in Crawford did acknowledge that

“[t]he [Confrontation] Clause . . . does not bar the use of testimonial statements for

purposes other than establishing the truth of the matter asserted.” 541 U.S. at 59

n.9, 158 L. Ed. 2d at 198 n.9 (citing Tennessee v. Street, 471 U.S. 409, 414, 85 L. Ed.

2d 425, 431 (1985)); State v. Ortiz-Zape, 367 N.C. 1, 6, 743 S.E.2d 156, 160 (2013)

(quoting Crawford). In doing so, Crawford recognized that most of the exceptions to

the hearsay rule cover statements that by their nature are not testimonial and,

therefore, do not present a Confrontation Clause problem. 541 U.S. at 56, 158 L. Ed.

2d at 195–96 (“[T]here is scant evidence that [hearsay] exceptions were invoked to

admit testimonial statements against the accused in a criminal case. Most of the

 - 12 -
 STATE V. MCLAUGHLIN

 Opinion of the Court

hearsay exceptions covered statements that by their nature were not testimonial—

for example, business records or statements in furtherance of a conspiracy.” (footnote

omitted)).

 Moving beyond a historical or literal interpretation of the Confrontation

Clause, the U.S. Supreme Court, for decades before its decision in Crawford, had

consistently conceptualized the Sixth Amendment as a substantive guarantee of the

reliability of evidence. See, e.g., Ohio v. Roberts, 448 U.S. 56, 66, 65 L. Ed. 2d 597,

608 (1980) (“[W]hen a hearsay declarant is not present for cross-examination at trial,

the Confrontation Clause normally requires a showing that he is unavailable. Even

then, his statement is admissible only if it bears adequate ‘indicia of reliability.’

Reliability can be inferred without more in a case where the evidence falls within a

firmly rooted hearsay exception.”); Idaho v. Wright, 497 U.S. 805, 819–20, 111 L. Ed.

2d 638, 655 (1990) (holding that hearsay evidence admitted under the Confrontation

Clause’s “particularized guarantees of trustworthiness” requirement must be so

trustworthy that cross-examination of declarant would be of marginal utility). It was

not until the U.S. Supreme Court’s opinion in Crawford that a defendant’s right to

confront his accuser was treated as a procedural requirement:

 To be sure, the Clause’s ultimate goal is to ensure
 reliability of evidence, but it is a procedural rather than a
 substantive guarantee. It commands, not that evidence be
 reliable, but that reliability be assessed in a particular
 manner: by testing in the crucible of cross-examination.
 The Clause thus reflects a judgment, not only about the

 - 13 -
 STATE V. MCLAUGHLIN

 Opinion of the Court

 desirability of reliable evidence (a point on which there
 could be little dissent), but about how reliability can best
 be determined.

541 U.S. at 61–62, 158 L. Ed. 2d at 199 (citations omitted).

 While Crawford acknowledges that the “ultimate goal” of the Confrontation

Clause is to ensure reliability, it nevertheless mandates strict adherence to the black

letter of the Clause itself when testimonial, out-of-court statements are at issue,

requiring that “[t]estimonial statements of witnesses absent from trial [be] admitted

only where the declarant is unavailable, and only where the defendant has had a

prior opportunity to cross-examine.” Id. at 59, 158 L. Ed. 2d at 197; see also State v.

Jackson, 216 N.C. App. 238, 241, 717 S.E.2d 35, 38 (2011) (citation omitted) (“The

elements of confrontation include the witness’s: physical presence; under-oath

testimony; cross-examination; and exposure of his demeanor to the jury.”).

Accordingly, Confrontation Clause analysis begins with a determination of whether

or not an out-of-court statement is testimonial or nontestimonial. See Crawford, 541

U.S. at 68, 158 L. Ed. 2d at 203.

 “[W]hen the hearsay statement at issue [is] not testimonial,” the U.S. Supreme

Court has “considered reliability factors beyond prior opportunity for cross-

examination . . . .” Id. at 57, 158 L. Ed. 2d at 196 (citing Dutton v. Evans, 400 U.S.

74, 87–89, 27 L. Ed. 2d 213, 226–27 (1970) (plurality opinion)). However, “[w]here

testimonial statements are involved, . . . the Framers [did not mean] to leave the

 - 14 -
 STATE V. MCLAUGHLIN

 Opinion of the Court

Sixth Amendment’s protection to the vagaries of the rules of evidence, much less to

amorphous notions of ‘reliability.’ ” Id. at 61, 158 L. Ed. 2d at 199.

 Unfortunately, Crawford declined to go any further in clarifying the precise

difference between testimonial and nontestimonial statements for purposes of

Confrontation Clause analysis other than stating as follows:

 Where nontestimonial hearsay is at issue, it is wholly
 consistent with the Framers’ design to afford the States
 flexibility in their development of hearsay law—as does
 [Ohio v.] Roberts, and as would an approach that exempted
 such statements from Confrontation Clause scrutiny
 altogether. Where testimonial evidence is at issue,
 however, the Sixth Amendment demands what the
 common law required: unavailability and a prior
 opportunity for cross-examination. We leave for another
 day any effort to spell out a comprehensive definition of
 “testimonial.” Whatever else the term covers, it applies at
 a minimum to prior testimony at a preliminary hearing,
 before a grand jury, or at a former trial; and to police
 interrogations. These are the modern practices with
 closest kinship to the abuses at which the Confrontation
 Clause was directed.

Id. at 68, 158 L. Ed. 2d at 203 (footnote omitted). Indeed, the U.S. Supreme Court,

on “another day,” did further define testimonial statements, although in the limited

context of statements made to police officers:

 Statements are nontestimonial when made in the course of
 police interrogation under circumstances objectively
 indicating that the primary purpose of the interrogation is
 to enable police assistance to meet an ongoing emergency.
 They are testimonial when the circumstances objectively
 indicate that there is no such ongoing emergency, and that
 the primary purpose of the interrogation is to establish or

 - 15 -
 STATE V. MCLAUGHLIN

 Opinion of the Court

 prove past events potentially relevant to later criminal
 prosecution.

Davis v. Washington, 547 U.S. 813, 822, 165 L. Ed. 2d 224, 237 (2006). However, the

existence of an ongoing emergency is not dispositive to the issue of whether the

statement is testimonial in nature. Michigan v. Bryant, 562 U.S. 344, 366, 179 L. Ed.

2d 93, 112 (2011). Rather, “whether an ongoing emergency exists is simply one

factor—albeit an important factor—that informs the ultimate inquiry regarding the

‘primary purpose’ of an interrogation.” Id.

 Most recently, the U.S. Supreme Court has proceeded to establish the test for

statements made to individuals who are not law enforcement officers: “In the end, the

question is whether, in light of all the circumstances, viewed objectively, the ‘primary

purpose’ of the conversation was to ‘creat[e] an out-of-court substitute for trial

testimony.’ ” Ohio v. Clark, ___ U.S. ___, ___, 192 L. Ed. 2d 306, 315 (2015) (alteration

in original) (quoting Bryant, 562 U.S. at 358, 179 L. Ed. 2d at 107). In determining

the “primary purpose” of the conversation, “[c]ourts must evaluate challenged

statements in context, and part of that context is the questioner’s identity.” Id. at

___, 192 L. Ed. 2d at 317 (citation omitted); see also State v. Lewis, 360 N.C. 1, 21,

619 S.E.2d 830, 843 (2005) (stating that “an additional prong of the analysis for

determining whether a statement is ‘testimonial’ is, considering the surrounding

circumstances, whether a reasonable person in the declarant’s position would know

or should have known his or her statements would be used at a subsequent trial” and

 - 16 -
 STATE V. MCLAUGHLIN

 Opinion of the Court

that “[t]his determination is to be measured by an objective, not subjective,

standard”), vacated and remanded, Lewis v. North Carolina, 548 U.S. 924, 165 L. Ed.

2d 985 (2006) (remanding for further consideration in light of Davis v. Washington,

547 U.S. 813, 165 L. Ed. 2d 274 (2006)).

 Based on all of the foregoing—from the history of the Confrontation Clause,

rooted in Roman times and the English common law, to the Clause’s shifting

jurisprudence in the U.S. Supreme Court’s opinions in Crawford (holding that

reliability must be assessed by “testing in the crucible of cross-examination”), Davis

(defining when statements to law enforcement are “testimonial”), and Clark

(prohibiting out-of-court statements introduced for the primary purpose of providing

a substitute for in-court testimony)—we conclude that the Confrontation Clause

should not be read to categorically require confrontation in all cases; rather, in

determining what the Clause does require, the underlying purpose of the Clause

should be at the beginning and the end of the analysis.

 The underlying purpose of the Confrontation Clause is to ensure the reliability

of evidence and to facilitate the fact-finding function of the trial court. It is this

purpose—ensuring the reliability of evidence—that should be at the forefront of the

analysis. This is especially true in cases of child sexual abuse, where children are

often incompetent or (as in this case) unavailable to testify. The purpose of the

Confrontation Clause should not be subverted by such strict adherence to its

 - 17 -
 STATE V. MCLAUGHLIN

 Opinion of the Court

language regarding “confrontation” where the purpose of the Clause is otherwise

satisfied.

 “The physical presence, or ‘face-to-face,’ requirement embodies the general

Confrontation Clause protection of an accused’s ‘right [to] physically face those who

testify against him.’ ” Jackson, 216 N.C. App. at 241, 717 S.E.2d at 38 (alteration in

original) (quoting Pennsylvania v. Ritchie, 480 U.S. 39, 51, 94 L. Ed. 2d 40, 53 (1987)).

“But, this general rule ‘must occasionally give way to considerations of public policy

and the necessities of the case.’ ” Id. (quoting Mattox, 156 U.S. at 243, 39 L. Ed. at

411).

 Keeping in mind the ultimate goal of the Sixth Amendment, the Clause’s

purpose may be satisfied by taking into consideration the totality of the

circumstances, including, but not limited to, the following: (1) statements which are

admitted that are by their nature nontestimonial; (2) statements which fall under an

exception “derived from the experience that some out-of-court statements are just as

reliable as cross-examined in-court testimony due to the circumstances under which

they were made,” like those made for the purpose of medical diagnosis or treatment,

see Crawford, 541 U.S. at 74, 158 L. Ed. 2d at 206; (3) to whom the out-of-court

statement was made, see Clark, ___ U.S. at ___, 192 L. Ed. 2d at 317; Davis, 547 U.S.

at 822, 165 L. Ed. 2d at 237; (4) the “primary purpose” for which the out-of-court

statement was made, see Bryant, 562 U.S. at 366, 179 L. Ed. 2d at 112; (5) the primary

 - 18 -
 STATE V. MCLAUGHLIN

 Opinion of the Court

purpose for which the out-of-court statement is offered at trial, see Clark, ___ U.S. at

___, 192 L. Ed. 2d at 316; and (6) public policy concerns, i.e., “balanc[ing] the need for

child sex crime victims’ testimony against the risk of engendering further emotional

distress.” Jackson, 216 N.C. App. at 38, 717 S.E.2d at 241 (citation omitted); see also

Maryland v. Craig, 497 U.S. 836, 852–53, 111 L. Ed. 2d 666, 683 (1990) (deeming the

interest in safeguarding child abuse victims from further trauma to be a compelling

one that, depending on the necessities of the case, may outweigh a defendant’s right

to face his accusers in court). None of the aforementioned considerations should be

considered dispositive; rather, they should inform the court’s analysis in keeping with

the true guarantee of the Confrontation Clause—to ensure the trustworthiness of the

evidence presented to the court and the jury.

 Returning to defendant’s argument—that his constitutional right to confront

his accuser was violated when the trial court allowed into evidence Preston’s CAC

interview in lieu of his live testimony—we directly address, as a threshold matter,

the State’s argument that defendant failed to preserve this issue for appeal.

 At the conclusion of the 25 April 2014 hearing on the admissibility of the

victim’s videotaped CAC interview, the trial court, with consent of the parties,

reserved final ruling on the hearsay and Confrontation Clause issues presented.

Instead, the court limited its ruling because the judge presiding over the hearing, the

 - 19 -
 STATE V. MCLAUGHLIN

 Opinion of the Court

Honorable C.W. Bragg, was not certain he would be the judge presiding at trial. In

fact, the Honorable Jeffrey P. Hunt presided over the trial.

 Despite defendant’s arguments during the 25 April 2014 pretrial conference

regarding defendant’s Sixth Amendment rights and objections to the admission of the

CAC interview as testimonial evidence in a written order dated 31 July 2014, the trial

court ruled that it was admissible as a statement made for medical diagnosis or

treatment. The written order ruled on the hearsay argument but not on any

Confrontation Clause grounds.

 At trial, defendant renewed his objections to the CAC interview: “I would ask

the Court to note my objection. I’d rest on my previous arguments and any arguments

I’ve made subsequent to the Court that have been recorded in our previous discussion

outside the presence of the jury.”

 The State argues, although on different grounds, that defendant failed to

preserve his Confrontation Clause argument for appeal. Specifically, the State

argues that defendant waived review of the Confrontation Clause issue by failing to

obtain a ruling pursuant to N.C. R. App. 10(a)(1) (2013). While defendant never

obtained a direct ruling on the Confrontation Clause argument from the trial court,

because defendant made proper objections at the pretrial conference and again at

trial, and because the testimony was allowed over defendant’s objection, we

determine the issue was properly preserved for appeal.

 - 20 -
 STATE V. MCLAUGHLIN

 Opinion of the Court

 Proceeding to the merits of defendant’s argument, defendant contends that the

trial court’s admission of the CAC interview under the medical diagnosis or treatment

exception to the hearsay rule violated his constitutional right to confrontation and

further that Preston’s statements made to Nurse Puga were testimonial, inadmissible

hearsay in light of her mandatory duty to report child abuse under North Carolina

law. [R. at 39]. We disagree.

 “The standard of review for alleged violations of constitutional rights is de

novo.” State v. Graham, 200 N.C. App. 204, 214, 683 S.E.2d 437, 444 (2009) (citation

omitted).

 N.C. Gen. Stat. § 8C-1, Rule 803(4), states as follows:

 (4) Statements for Purposes of Medical Diagnosis or
 Treatment—Statements made for purposes of medical
 diagnosis or treatment and describing medical history, or
 past or present symptoms, pain, or sensations, or the
 inception or general character of the cause or external
 source thereof insofar as reasonably pertinent to diagnosis
 or treatment.

N.C. Gen. Stat. § 8C-1, Rule 803(4) (2015). “The test to determine whether

statements are admissible under Rule 803(4) is a two-part test: ‘(1) whether the

declarant’s statements were made for purposes of medical diagnosis or treatment;

and (2) whether the declarant’s statements were reasonably pertinent to diagnosis or

treatment.’ ” State v. Burgess, 181 N.C. App. 27, 35, 639 S.E.2d 68, 74 (2007) (quoting

State v. Hinnant, 351 N.C. 277, 284, 523 S.E.2d 663, 667 (2000)) (finding the

 - 21 -
 STATE V. MCLAUGHLIN

 Opinion of the Court

defendant’s Crawford argument unpersuasive where child sex abuse victims’

videotaped interviews were admitted at trial and where each took the stand and was

available for cross-examination). “Testimony meeting this test is considered

inherently reliable because of the declarant’s motivation to tell the truth in order to

receive proper treatment.” Id. (citation omitted) (internal quotation marks omitted).

The proponent of such testimony must establish “that the declarant made the

statements understanding that they would lead to medical diagnosis or treatment.”

Id. (citation omitted).

 Notably, in an opinion following Crawford, this Court held that a young child’s

statements to medical personnel regarding sexual abuse were not testimonial and the

defendant’s confrontation rights were not violated where the child was deemed

unavailable to testify pursuant to N.C. Gen. Stat. § 8C-1, Rule 804(b)(5). State v.

Brigman, 178 N.C. App. 78, 87–88, 91, 632 S.E.2d 498, 505–07 (2006). In “considering

the surrounding circumstances,” this Court in Brigman held that it could not

“conclude that a reasonable child under three years of age would know or should know

that his statements might later be used at trial.” Id. at 90–91, 632 S.E.2d at 506.

 Even where, as here, the child is older (fifteen), an objective determination of

this record does not lead to the assumption that the victim might reasonably be

expected to “know that his statements might later be used at trial.” See id. at 91, 632

S.E.2d at 506. It is particularly this Court’s “consider[ation of] the surrounding

 - 22 -
 STATE V. MCLAUGHLIN

 Opinion of the Court

circumstances” that is significant to its Confrontation Clause analysis in light of

Crawford. Id. at 90–91, 632 S.E.2d at 506–07. In other words, “considering the

surrounding circumstances” in the instant case not only includes looking at the age

of the declarant, but also examining other factors, such as the primary purpose for

which the statements were made. See id.

 Here, Nurse Puga’s questions in the CAC interview reflected the primary

purpose of attending to the victim’s physical and mental health and his safety: she

explained to Preston that he was there for a checkup; she asked Preston if he had any

health issues, took medicine, had had any accidents, broken bones, scars, surgeries,

hospitalizations, or infections. She emphasized to Preston the importance of knowing

what had happened from beginning to end so they could make sure he did not have

any diseases or other issues that could affect him for the rest of his life.

 Defendant complains that some of the questions asked, such as the importance

of telling the truth, were not pertinent to medical diagnosis or treatment. However,

these questions were crucial to establishing a rapport with the victim and impressing

upon him the need to be open and honest about very personal and likely embarrassing

details pertinent to his well-being. Likewise, having the victim relate the details from

beginning to end helped the medical practitioners to evaluate the extent of the mental

and physical trauma to which the victim was exposed, inquire as to whether the

victim was out of danger, and discover whether other abusers or victims may have

 - 23 -
 STATE V. MCLAUGHLIN

 Opinion of the Court

been involved.3 Similar to instances where the “statements occurred in the context

of an ongoing emergency involving suspected child abuse[,]” Clark, ___ U.S. at ___,

192 L. Ed. 2d at 315, here, the detailed statements were necessary to determine the

extent to which it was medically necessary to protect the victim’s physical and mental

health, or to protect someone else from child sexual abuse. Accordingly, the

statements were not inadmissible hearsay, and the trial court did not err in admitting

the CAC interview into evidence under the medical diagnosis and treatment

exception to the hearsay rule.

 Defendant also argues that because all North Carolinians have a mandatory

duty to report suspected child abuse to the Department of Social Services (“DSS”), see

N.C. Gen. Stat. § 7B-301 (2015), Preston’s statements in the CAC interview are

testimonial in nature and were made for the primary purpose of later prosecution.

Defendant reaches the categorical conclusion that, because of the mandatory

reporting law, “[w]hen questioning a child about suspected abuse, the Child Advocacy

Center employee acts in a dual capacity as a health worker and as an agent of the

state for law-enforcement purposes.” We disagree.

 In Clark, the defendant unsuccessfully argued that a three-year-old child’s out-

of-court statements made to his preschool teacher were testimonial in light of the

 3Indeed, in Clark, just as in the present case, there turned out to be a sibling who was also
abused and in need of protection. See ___ U.S. at ___, 192 L. Ed. 2d at 312, 315.

 - 24 -
 STATE V. MCLAUGHLIN

 Opinion of the Court

teacher’s mandatory duty to report child abuse to authorities under Ohio law.4 ___

U.S. at ___, 192 L. Ed. 2d at 317. The U.S. Supreme Court in Clark has summarily

rejected this argument: “[M]andatory reporting statutes alone cannot convert a

conversation between a concerned teacher and her student into a law enforcement

mission aimed primarily at gathering evidence for prosecution.” Id. (“[The defendant]

emphasizes Ohio’s mandatory reporting obligations, in an attempt to equate [the

victim’s] teachers with the police and their caring questions with official

interrogations. But the comparison is inapt. . . . It is irrelevant that the teachers’

questions and their duty to report the matter had a natural tendency to result in [the

defendant’s prosecution.”).

 Thus, the mere fact that CAC employees have a mandatory duty to report

suspected child abuse does not transform the primary purpose of the CAC interview

into one intended to create an out-of-court substitute for trial testimony.5 Rather, all

 4 “Under Ohio law, children younger than 10 years old are incompetent to testify if they ‘appear
incapable of receiving just impressions of the facts and transactions respecting which they are
examined, or of relating them truly.’ ” Clark, ___ U.S. at ___, 192 L. Ed. 2d at 312 (quoting Ohio Rule
Evid. 601(A) (Lexis 2010)).
 5 We do not posit that the CAC interview is a substitute for in-court testimony, but, where, as

here, the declarant is unavailable, his video recorded medical interview is sufficiently reliable to be
admissible. Therefore, the jury is able to assess the testimony, to observe the demeanor of the
declarant, to determine the credibility and trustworthiness of his statements, and thereby perform
their function as a jury. This helps satisfy the ultimate goal of the Confrontation Clause. See Idaho
v. Wright, 497 U.S. 805, 821–22, 111 L. Ed. 2d 638, 656 (1990) (“The state and federal courts have
identified a number of factors that we think properly relate to whether hearsay statements made by a
child witness in child sexual abuse cases are reliable. See, e.g., State v. Robinson, 153 Ariz. 191, 201,
735 P.2d 801, 811 (1987) (spontaneity and consistent repetition); Morgan v. Foretich, 846 F.2d 941,
948 (CA4 1988) (mental state of the declarant); State v. Sorenson, 143 Wis. 2d 226, 246, 421 N.W.2d
77, 85 (1988) (use of terminology unexpected of a child of similar age); State v. Kuone, 243 Kan. 218,

 - 25 -
 STATE V. MCLAUGHLIN

 Opinion of the Court

of the factors here and discussed previously indicate that the primary purpose of the

interview was to safeguard the mental and physical health of the child, and not for

creating a substitute for in-court testimony.

 Defendant also maintains that Nurse Puga’s knowledge that her interview

would be turned over to the police, as well as some of the questions she asked, reflect

an interrelationship between the CAC and law enforcement. Again, this is not the

test. The test is whether the interviewer’s primary purpose was to create a substitute

for in-court testimony. See id. at ___, 192 L. Ed. 2d at 314. Here, Nurse Puga is a

health-care practitioner, not a person principally charged with uncovering and

prosecuting criminal behavior. “Statements made to someone who is not principally

charged with uncovering and prosecuting criminal behavior are significantly less

likely to be testimonial than statements given to law enforcement officers.” Id. at

___, 192 L. Ed. 2d at 317 (citation omitted).

 Here, as in Clark, “[a]t no point did [Nurse Puga] inform [Preston] that his

answers would be used to arrest or punish his abuser.” Id. at ___, 192 L. Ed. 2d at

221–22, 757 P.2d 289, 292–93 (1988) (lack of motive to fabricate). Although these cases (which we cite
for the factors they discuss and not necessarily to approve the results that they reach) involve the
application of various hearsay exceptions to statements of child declarants, we think the factors
identified also apply to whether such statements bear ‘particularized guarantees of trustworthiness’
under the Confrontation Clause. These factors are, of course, not exclusive, and courts have
considerable leeway in their consideration of appropriate factors. We therefore decline to endorse a
mechanical test for determining ‘particularized guarantees of trustworthiness’ under the Clause.
Rather, the unifying principle is that these factors relate to whether the child declarant was particularly
likely to be telling the truth when the statement was made.” (emphasis added)), overruling recognized
by Desai v. Booker, 732 F.3d 628 (6th Cir. 2013).

 - 26 -
 STATE V. MCLAUGHLIN

 Opinion of the Court

316. Furthermore, it was not anticipated that the declarant would not be available

to testify at trial, not to mention the tragic circumstances that caused his

unavailability. In fact, the record is replete with references to Preston’s general

eloquence and intelligence, and it is not likely that he would have been declared

incompetent to testify at trial, particularly considering his age and understanding of

the importance of telling the truth. Cf. State v. Waddell, 351 N.C. 413, 421–22, 527

S.E.2d 644, 650 (2000) (noting that child victim of sexual abuse was incompetent to

testify at trial where he did not understand the need to tell the truth).

 Defendant maintains that an analysis of the primary purpose of the CAC

interview must begin with who sent the victim to the CAC. Contrary to defendant’s

assumptions about the relevance of the referral, Dr. Conroy, who conducted Preston’s

medical exam following Nurse Puga’s interview, expressly testified that regardless of

who makes the referral, she is still going to assess the whole child and obtain the

same information; that her examination is not law-enforcement-driven in any way;

that the CAC receives referrals from many sources, and often gets multiple referrals;

that while in this particular case, she recalled law enforcement making the referral,

this did not change the examination.

 Defendant’s constitutional argument fails where circumstances objectively

reflect that (1) the primary purpose of the CAC interview was to promote the victim’s

health and well-being; (2) the statements were made to a nurse, not law enforcement,

 - 27 -
 STATE V. MCLAUGHLIN

 Opinion of the Court

notwithstanding the nurse’s mandatory duty to report suspected abuse to law

enforcement; (3) the statements were not intended primarily for purposes of

prosecution; and (4) the CAC interview was admitted under an exception for

statements made in the course of obtaining medical diagnosis or treatment—the

wisdom of which has been long recognized. See Crawford, 541 U.S. at 74, 158 L. Ed.

2d at 206. Accordingly, defendant’s arguments are overruled.

 II

 Defendant next argues that the trial court erred in admitting Preston’s 14

March 2010 statements to his mother under the excited utterance hearsay exception,

arguing instead that the statements were inadmissible hearsay. We disagree.

 “The trial court’s determination as to whether an out-of-court statement

constitutes hearsay is reviewed de novo on appeal.” State v. Castaneda, 215 N.C.

App. 144, 147, 715 S.E.2d 290, 293, (2011) (citation omitted).

 Hearsay is defined as “a statement, other than one made by the declarant while

testifying at the trial or hearing, offered in evidence to prove the truth of the matter

asserted.” N.C. Gen. Stat. § 8C-1, Rule 801(c) (2015). The excited utterance hearsay

exception allows admission of out-of-court statements “relating to a startling event or

condition made while the declarant was under the stress of excitement caused by the

event or condition.” N.C. Gen. Stat. § 8C-1, Rule 803(2) (2015). To qualify as an

excited utterance, the statement must relate to “(1) a sufficiently startling experience

 - 28 -
 STATE V. MCLAUGHLIN

 Opinion of the Court

suspending reflective thought and (2) [be] a spontaneous reaction, not one resulting

from reflection or fabrication.” State v. Maness, 321 N.C. 454, 459, 364 S.E.2d 349,

351 (1988) (citation omitted). Additionally, “[a]lthough the requirement for

spontaneity is often measured in terms of the time lapse between the startling event

and the statement, . . . the modern trend is to consider whether the delay in making

the statement provided an opportunity to manufacture or fabricate the statement.”

State v. Smith, 315 N.C. 76, 87, 337 S.E.2d 833, 841 (1985) (citation omitted) (internal

quotation marks omitted).

 Defendant argues that Preston’s disclosure to his mother does not fall within

the excited utterance hearsay exception as it was a product of reflective thought.

Defendant argues that because there was a ten-day gap between the last incident of

sexual abuse on 4 March 2010 and Preston’s statements to Rebekah on 14 March

2010, Preston had time for reflective thought. We disagree.

 At the 25 April 2014 pretrial hearing, the trial court examined the

admissibility of Preston’s 14 March 2010 statements to Rebekah made immediately

upon returning to Florida. Rebekah testified that when Preston arrived home with

defendant, Preston came into the house “frantically” and was “shaking” while telling

her, “You got to call the police right now.” According to Rebekah, when she asked

Preston, “Why? For what? What’s wrong,” Preston said, “It’s [defendant].” Rebekah

stated that she and Preston “got right in the car, and he told her right away” about

 - 29 -
 STATE V. MCLAUGHLIN

 Opinion of the Court

the abuse. The trial court issued a detailed order concluding Preston’s statements to

Rebekah were admissible as excited utterances and, alternatively, could be used to

corroborate his statements to Nurse Puga.

 The excited utterance exception applies after a delay typically in cases

involving young children, as “the stress and spontaneity upon which the exception is

based is often present for longer periods of time in young children than adults.” Id.

(citation omitted); see id. at 88, 337 S.E.2d at 842 (granting leeway with time element

where declarant/victims were four- and five-year-olds making utterances two or three

days after abuse, and holding that “[s]pontaneity and stress are the crucial factors,”

rather than time). Additionally, the North Carolina appellate courts have granted

leeway with young child victims not only because they generally lack the capacity to

fabricate, but also because they “may not make immediate complaint because of

threats, fear of reprisals, admonishments of secrecy, or other pressures not to

disclose, particularly where . . . the child had a close relationship with the offender.”

Id. at 89, 337 S.E.2d at 842 (citation omitted) (internal quotation marks omitted).

 The situation here is not necessarily in accord with cases granting more leeway

with the time element of the excited utterance analysis because the declarants

therein were children much younger than Preston, who was fifteen years old. See,

e.g., id. at 88, 337 S.E.2d at 842. However, while this victim was fifteen rather than

 - 30 -
 STATE V. MCLAUGHLIN

 Opinion of the Court

four or five years of age, he was nevertheless a minor and that fact should not be

disregarded in the analysis.

 Additionally, defendant contends that because Preston first tried

communicating the allegations regarding the abuse to his father via email, his later

statements to his mother fall outside the range of admissible excited utterances.

Specifically, defendant argues that Preston’s statement to his mother was the product

of reflective thought based on Preston’s explanation to Nurse Puga regarding his

decision to reveal the abuse:

 [Puga]: Okay, and tell me about what made you finally
 decide to, like, to disclose when you came back?

 [Preston]: Well, again, my dad, he’s just, oh, when I came
 back? See, now I know, um, my dad didn’t say anything
 about it that day because he didn’t read his email, so I
 figured I have to tell someone right now. So I told my mom.

 [Puga]: And what, how did you decide this was the time to
 tell, to, to do something?

 [Preston]: She has, I mean, I hadn’t had any stronger
 feelings about it over the last few years because, I mean, if
 I tell someone I’m gonna be super scared. But if I caught,
 you know, [defendant] whatever he is called on a good note,
 he wouldn’t think anything’s up, and, um, I figured, you
 know, now is the time. You know, in the military strategy
 there’s always a time to strike.

 [Puga]: Uh huh.

 [Preston]: Well, that was the time.

 - 31 -
 STATE V. MCLAUGHLIN

 Opinion of the Court

 However, a declarant’s statements can still be spontaneous, even where he

previously made the same ones to a different person, as long as there was, as there

was here, sufficient evidence to establish that the declarant was under the stress of

a startling event and had no opportunity to fabricate. See State v. Coria, 131 N.C.

App. 449, 452, 508 S.E.2d 1, 3 (1998) (concluding statements made to police officer by

a seventeen-year-old victim of physical abuse by her father were exited utterances,

even though the victim had previously made similar statements to another person).

Additionally, defendant’s argument that Preston’s explanation demonstrated

reflective thought (“in military strategy there’s always a time to strike”), is

unpersuasive where the trial evidence overwhelmingly established that Preston

feared reprisal from defendant for his disclosure—as he had received threats from

defendant in the past—and which undoubtedly delayed disclosure.

 As stated previously, until some event prompts them to disclose, children

generally delay disclosure “because of threats, fear of reprisals, admonishments of

secrecy, or other pressures not to disclose.” Smith, 315 N.C. at 89, 337 S.E.2d at 842.

 Defendant argues that the critical question at issue in determining the

admissibility of these statements under Rule 803(2) is why Preston decided to reveal

the abuse to his mother days after the last incident. However, defendant’s narrow

analysis of the issue does not account for the five-to-six-year pattern of sexual abuse,

concluding in an incident occurring ten days prior to Preston’s excited utterances. It

 - 32 -
 STATE V. MCLAUGHLIN

 Opinion of the Court

does not account for the fact that Preston was afraid of defendant, defendant had

been violent towards Preston in the past, and during the return trip home, defendant

had been “extremely pissed” at Preston.

 Defendant’s narrow analysis also does not account for the fact that Preston

made his statements immediately upon leaving the custody of the person who had

sexually abused him for the past several years. See State v. Jones, 89 N.C. App. 584,

595, 367 S.E.2d 139, 146 (1988) (concluding that statements by a child concerning

sexual abuse were spontaneous because they were made only ten hours after child

left abuser’s custody), overruled on other grounds by Hinnant, 351 N.C. at 287, 523

S.E.2d at 669 (overruling based on the analysis in Jones regarding statements made

for purposes of medical diagnosis or treatment). Ultimately, “ ‘the character of the

transaction or event will largely determine the significance of the time factor’ ” in the

excited utterance analysis. State v. Kerley, 87 N.C. App. 240, 243, 360 S.E.2d 464,

466 (1987) (quoting Rule 803(2) official commentary). Based on the foregoing

analysis, we hold that Preston’s statements to his mother were properly admitted

under Rule 803(2) as excited utterances. Defendant’s hearsay challenge is overruled.

 III

 Lastly, defendant argues that the trial court plainly erred in admitting

evidence linking Preston’s suicide to the sexual abuse. Specifically, defendant

challenges testimony from counselor Susan Sikes regarding “the likelihood of an

 - 33 -
 STATE V. MCLAUGHLIN

 Opinion of the Court

abused child committing suicide,” and that Preston’s disclosure of sexual abuse

“certainly could be a factor in his suicide.” Defendant argues that (1) evidence

regarding Preston’s suicide was not relevant, and even if relevant, was grossly

prejudicial; and (2) Sikes’s testimony did not meet the admissibility standards of

amended Rule of Evidence 702(a) in that Sikes was not qualified to give that

testimony.

 Defendant’s counsel did not object to Sikes’s testimony as to the link between

Preston’s suicide and sexual abuse. Therefore, the issue is whether introduction of

her opinion constituted plain error:

 For error to constitute plain error, a defendant must
 demonstrate that a fundamental error occurred at trial. To
 show that an error was fundamental, a defendant must
 establish prejudice—that, after examination of the entire
 record, the error had a probable impact on the jury’s
 finding that the defendant was guilty. Moreover, because
 plain error is to be applied cautiously and only in the
 exceptional case, the error will often be one that seriously
 affect[s] the fairness, integrity, or public reputation of
 judicial proceedings.

State v. Lawrence, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (alteration in

original) (internal citations and quotation marks omitted).

 Defendant argues that any evidence alluding to or linking the suicidal death

of Preston to any acts of defendant was irrelevant, or alternatively, even if relevant,

any probative evidence regarding the suicide was substantially outweighed by the

danger of unfair prejudice.

 - 34 -
 STATE V. MCLAUGHLIN

 Opinion of the Court

 Only relevant evidence is admissible at trial. N.C. Gen. Stat. § 8C-1, Rule 402

(2015). Relevant evidence is “evidence having any tendency to make the existence of

any fact that is of consequence to the determination of the action more probable or

less probable than it would be without the evidence.” N.C. Gen. Stat. § 8C-1, Rule

401 (2015). Relevant evidence may be admissible if the probative effect of the

evidence is substantially outweighed by the danger of unfair prejudice. N.C. Gen.

Stat. § 8C-1, Rule 403 (2015).

 Preston made his allegations of sexual abuse in March 2010. Two years later

he committed suicide while he was an in-patient in a medical treatment center. At

the pretrial hearing, the trial court ruled on defendant’s motion in limine to exclude

evidence directly linking Preston’s suicide to the acts of defendant, stating that “the

State is prohibited in this trial, either side, from saying definitively that the suicide

was caused by any particular causation.”

 At trial, Sikes, a licensed professional counselor who counseled children and

victims of sexual abuse, was offered and received as an expert in professional

counseling. Sikes did not testify that Preston’s suicide was a direct result of

defendant’s acts. Rather, she testified to the correlation between sexual abuse and

suicidal ideation and cited to various peer-reviewed studies which found that sexually

abused males are four to eleven times more likely to exhibit suicidal ideation and

behaviors than males who have not experienced sexual abuse.

 - 35 -
 STATE V. MCLAUGHLIN

 Opinion of the Court

 Evidence of and relating to Preston’s suicide was relevant in this case because,

although not necessarily part of defendant’s commission of the actual crime, it

“form[ed] an integral and natural part of an account of the crime, [and was] necessary

to complete the story of the crime for the jury.” State v. Agee, 326 N.C. 542, 548, 391

S.E.2d 171, 174–75 (1990) (citation omitted). Furthermore, defendant cannot

establish that “a fundamental error occurred at trial,” meaning one that “had a

probable impact on the jury’s finding that [he] was guilty.” Lawrence, 365 N.C. at

518, 723 S.E.2d at 334. This is primarily because evidence concerning the likelihood

of a child abuse victim being suicidal, as well as evidence specifically regarding

Preston’s suicidal ideation, his attempt, and the suicide itself, was all admitted

through other witnesses as well as parts of Sikes’s own testimony, to which defendant

did not object to at trial. Accordingly, even if we agree that evidence of Preston’s

suicide was relevant but nevertheless prejudicial, we find no plain error where there

was other overwhelming evidence from which the jury could have arrived at the same

verdict—that defendant sexually abused the victim.

 Defendant next argues that the portion of Sikes’s testimony on the link

between sexual abuse and suicide came before the jury without being evaluated under

the standard set out in amended Rule 702. Defendant was indicted on 11 April 2011,

and the amendment to Rule 702 applies only to defendants indicted after 1 October

2011. See N.C. Gen. Stat. § 8C-1, Rule 702 (2015), 2011 N.C. Sess. Laws 2011-283, §

 - 36 -
 STATE V. MCLAUGHLIN

 Opinion of the Court

1.3, eff. Oct. 1, 2011. Thus, the amendment to Rule 702 is inapplicable to defendant.

This argument is wholly without merit. Accordingly, defendant’s argument is

overruled.

 NO ERROR.

 Judges CALABRIA and ZACHARY concur.

 - 37 -